(Decided 2nd July, 1873.)

---

Charles W. Semmes *vs.* Benjamin J. Worthington, Trustee, and others. Benjamin J. Worthington, Trustee, and others, *vs.* Charles W. Semmes.

*Equity Pleading—Statute of Frauds—Specific Performance of a Contract to Devise real Estate—Specific Performance of Contracts—Character of Proof required to establish the Contract—Competency of a Witness—When a Court of Equity will interfere to compel the Specific execution of a Contract—Character of the acts of Part performance, to relieve a Contract of the operation of the Statute of Frauds.*

Where a complainant seeks the specific execution of a parol contract, within the Statute of Frauds, and the defendant by his answer denies the making

Semmes *vs.* Worthington, *et al.*

of the contract, it is not necessary for him to plead the Statute, or insist on it as a bar; but the complainant, in order to entitle himself to the relief prayed, must at the hearing fully establish the contract as alleged, and such acts of part performance thereof as will take the case out of the Statute.

A contract to devise real estate, if shown to be in all respects fair, just and reasonable, founded on sufficient consideration, and there be no doubt on the proof as to any of its terms, may be enforced by specific performance, by way of conveyance, as against the heirs or devisees of the party obligating himself to devise.

In all cases for specific performance the contract must be accurately stated in the bill, and the proof must in every essential particular correspond with the terms of the contract thus set up. The proof must be clear and explicit, leaving no room for reasonable doubt. And in cases for the specific enforcement of a contract to devise real estate, where the property has been devised to other parties, the utmost certainty is required, as by the enforcement of the contract, the Court undertakes to set aside a solemn testamentary act of the deceased party, in the absence of all possible explanation of his conduct, and when he is no longer present to vindicate himself against the imputation of bad faith.

In a proceeding in Equity to enforce against the estate of a deceased testator, an alleged parol contract on his part to devise a particular portion of his real estate to the complainant, in consideration of certain conduct and services to be performed by him, a person whose interest under the will of the testator, in the subject-matter in controversy, is altogether contingent and remote—being dependent upon the dying in her life-time and without issue, of two other persons—is a competent witness for the defendants, even according to the common law rule of evidence; and there is nothing in the Evidence Acts of 1864 and 1868, that can exclude, not being within the exceptions of these Acts.

Specific execution of contracts by Courts of Equity is not a matter of absolute right in the party applying, but of sound discretion in the Court, to be exercised upon consideration of all the circumstances of each particular case—this discretion, however, to be controlled by the established doctrines and settled principles upon the subject.

A Court of Equity will not, as a matter of course, exercise the power to compel or effect a specific execution of a contract, because the legal obligation under it may be perfect. In every case the question is, whether the exercise of the power is called for to subserve the ends of justice? and unless the Court is satisfied that the application to it, for this extraordinary assistance, is fair,

just and reasonable *in every respect*, it will refuse to interfere, and leave the party to other remedies for redress.

Where an act of part performance is relied on to relieve a contract of the operation of the Statute of Frauds, such act must in itself furnish evidence of the identity of the contract; it is not enough that it is evidence of some contract; it must relate to, and be unequivocal evidence of the particular contract charged in the bill. The contract must be clear and definite, and the act done should be equally clear and definite, and solely with a view to the performance of the particular agreement. The act done must be of a substantial nature, and such that the party would suffer an injury amounting to a *fraud* by the refusal to execute the agreement.

CROSS-APPEALS from the Circuit Court for Baltimore County, in Equity.

The bill of complaint in this case was filed on. the 28th of June, 1870, by Charles W. Semmes, against Benjamin J. Worthington, trustee under the will of Richard J. Worthington, deceased, and Mary J. Milnor, and Clara Semmes, infants, *cestuis que trust*, under said will, and J. N. L. Milnor, and Susan J. Milnor, his wife; the latter having under said will a contingent interest in the real estate in controversy. The object of the bill was to procure the specific execution of a parol contract, alleged to have been entered into between the testator, Richard J. Worthington, and the complainant in April, 1869, whereby in consideration of certain money paid, and certain services to be rendered, by the complainant to · the deceased, the latter agreed to devise the former certain real estate situated in Baltimore County, and known as "Bloomfield Farm and Race Course."

The facts of the case are sufficiently disclosed in the opinion of the Court and the arguments of counsel. The Circuit Court (GRASON and YELLOTT, J.,) on the 27th of March, 1873, decreed that the complainant was entitled to the specific performance by the defendants of the contract so far as the same related to the real estate known as "Bloomfield Farm," but not as to the "Race Course,"

and appointed a trustee to convey the said "Bloomfield Farm" to the complainant. Both sides appealed; the complainant from so much of the decree as limited his right to a conveyance of "Bloomfield Farm," and the defendants from the decree generally.

The cause was argued before BARTOL, C. J., MILLER, ALVEY, and ROBINSON, J.

*John P. Poe*, and *I. Nevett Steele*, for Charles W. Semmes.

The bill in this case seeks to procure the specific performance of a parol contract to devise real estate, upon the ground of part performance, sufficient under the established rule in such cases, to remove the bar of the Statute of Frauds.

The principle that equity in a proper case will specifically enforce an agreement to make a devise, is clearly and fully established. 2 *Parsons on Contracts*, 563; 3 *Parsons on Contracts*, 406; *Newland on Contracts*, 111; *Story's Eq. Jur.*, 781, 785; *Bingham on Sale of Real Prop.*, chap. 6, *p.* 310; *Logan vs. McGinnis*, 12 *Penn. St. Rep.*, 32; *McClure vs. McClure*, 1 *Penn. St. Rep.*, 374; *Brinker vs. Brinker*, 7 *Barr*, 53; *Johnson vs. Hubbell*, 2 *Stockton*, 332; *Van Dyne vs. Vreeland*, 3 *Stockton*, 370; *Davison vs. Davison*, 2 *Beasley*, 246; *Watson vs. Mahan*, 20 *Indiana*, 223; *Rhodes vs. Rhodes*, 3 *Sandford Ch.*, 279; *Lobdell vs. Lobdell*, 36 *N. Y.*, 327; *Freeman vs. Freeman*, 51 *Barb.*, 306, *and* 43 *N. Y.*, 34; *Wright vs Tinsley*, 30 *Mo*, 389; *Gupton vs. Gupton*, 47 *Mo.*, 37; *Izard vs. Middleton*, 1 *Dessaus.*, 116; *Rivers vs. Ex'rs. of Rivers*, 3 *Dessaus.*, 195; *Walpole vs. Orford*, 3 *Vesey*, 402; *Dufour vs. Pereira*, 1 *Dick.*, 419; *Loffus vs. Maw*, 3 *Giffard*, 592; *Smith's Manual of Equity*, 253-257; *Mundorff vs. Kilbourn*, 4 *Md.*, 463; *Johns vs. Johns*, 20 *Md.*, 58; *Whitridge & Alexander vs. Parkhurst*, 20 *Md.*, 62; *Frisby vs. Parkhurst*, 29 *Md.*, 58; *C. D. Owings' Case*, 1 *Bland*, 397.

"Every agreement to merit the interposition of a Court of Equity to enforce it, must be fair, just, reasonable, *bona fide*, certain in all its parts and mutual." *Gelston vs. Sigmund*, 27 *Md.*, 343; *Smith vs. Crandall*, 20 *Md.*, 500.

"If the contract be by parol and the party setting it up claims to take the case out of the Statute of Frauds on the ground of part performance of the contract, he must make out by clear and satisfactory proof, the existence of the contract as laid in the bill. The act of part performance must be of the identical contract set up. It is not enough that the act is evidence of some agreement; but it must be unequivocal and satisfactory evidence of the particular agreement charged in the bill."

"The complainant must establish the very contract set up in the bill—and all acts of part performance relied upon to take the case without the operation of the Statute of Frauds must be clear and definite, and refer exclusively to the alleged agreement." *Ches. & Ohio Canal Co. vs. Young*, 3 *Md.*, 490; *Mundorff vs. Kilbourn*, 4 *Md.*, 462; *Stoddert vs. Bowie*, 5 *Md.*, 35; *Billingslea vs. Ward*, 33 *Md.*, 51-52; *Nunn vs. Fabian*, 1 *Chancery App.*, 35 (*L. R.;*) *Shillibeer vs. Jarvis*, 8 *De G. M. & G.*, 79.

Has the complainant made out by clear and satisfactory proof the existence of the contract as alleged?

The proof upon this point is uncontradicted and conclusive.

Wilson C. Nicholas, testifies that after Semmes had left his uncle, Richard J. Worthington's place, (the real estate in controversy,) Franklin Slade was employed by Mr. Worthington to manage the farm. In a few days Worthington became dissatisfied and was anxious that Semmes should come back. He went to Nicholas and authorized him to go to Semmes and say that if he would come back and "attend to his business as he had done before he went away, that he, Mr. Worthington, would leave him Bloomfield at his death, and if he did'nt, he

should never see a damned cent of his property." Nicholas made known to Semmes the proposition—reasoned with him about it—urged him to accept it—and finally Semmes agreed to accept the terms offered, and did go back and take charge of the place upon the very terms proposed and none other. It became necessary then to get rid of Slade. The services of Nicholas were again invoked, and after some negotiation Slade was induced to leave, Semmes paying him in money and provisions one hundred dollars.

The testimony of so unimpeachable a witness as Nicholas, ought, standing alone, to be sufficient to prove the contract; but he is thoroughly and entirely corroborated by Henry Schwartz, whose testimony is to the same effect precisely. They were the neighbors and friends of Mr. Worthington; as such, they were applied to by him to prevail on Semmes to return. They bore his proposition to Semmes. They remonstrated with Semmes upon the folly of rejecting so beneficial and voluntary an offer from his uncle, and finally had influence enough with him to overcome his reluctance to go back, and to induce him to accept it. They reported his acceptance to Worthington, and Semmes accordingly did, in fact, return and remain there, discharging faithfully and fully his duties until Worthington's death, one year afterwards.

The existence of his will does not afford any ground for a presumption or inference against the contract, because the will was made some months *before* the contract, and the evidence shows that he intended to revoke it, but was prevented by his, to him, unexpectedly sudden death. In addition to Nicholas and Schwartz, other witnesses speak of the contract.

The contract was fair, just, and reasonable.

Mr. Worthington was about sixty years of age, and a bachelor—Semmes was his nephew—had lived with him for several years—knew his habits—attended diligently

to his affairs, and enjoyed his confidence and affectionate regard.

The agreement relieved him of all care and responsibility in the management of his estate, while at the same time preserving for him, during his life, as full and beneficial enjoyment of its revenue as he could secure by a regular letting on shares to a stranger to his blood. It operated as a perpetual restraint upon Semmes, and secured his fidelity and vigilance by every consideration of duty, good faith and self interest. It was at once the inducement to and the reward of affectionate treatment, and careful and profitable husbandry. Having no design, desire or occasion to sell, encumber or dispose of his estate, and there being not the least likelihood that he ever would wish or be obliged to do so, and having no wife or children to inherit his property, it was the most natural thing that he should have endeavored to secure a comfortable enjoyment of the remainder of his days by so sensible an agreement, while at the same time making a proper provision for his nephew, who had served him so long and so faithfully. If he had lived for twenty years after making it instead of one, everybody would readily admit that in his condition it would have been a most wise and prudent arrangement.

It is forbidden by no rule of law or of public policy. On the contrary, it belongs to a class of contracts, which as we have seen, equity constantly recognizes and enforces It was freely and voluntarily made, without suggestion from any one, least of all from Semmes. Mr. Worthington had a full and complete knowledge of his situation and his affairs, and there is no pretence that he was not competent to manage them with judgment, discrimination and independence. He had a right to make the contract. He was free to make it. The property was his own and he could dispose of it as he pleased, either by contract, sale or devise. No objection can be made to it

as being unreasonable that does not equally apply to all such agreements. And to hold that equity ought not to decree specific execution of this contract, because it may be supposed to be unreasonable, is in effect to overrule all similar cases and to say that no such agreement can hereafter be enforced in Maryland.

The relations of the parties must be considered, and what might be unreasonable or even unfair between strangers, would be perfectly natural between two persons standing towards each other as Semmes and Worthington did. *Shepherd vs. Bevin*, 9 *Gill*, 39; *Hays vs. Hollis*, 8 *Gill*, 367; *Haines vs. Haines*, 6 *Md.*, 435.

The contract was certain in all parts. The contracting parties are distinctly designated. The service to be rendered is plainly mentioned; its character and terms are clear and unambiguous. The subject-matter is absolutely certain. The obligations of both parties are wholly free from doubt.

"If you, Semmes, will come back and do as you did before, I will leave you this place at my death." "I, Semmes, agree to come back on these terms and no other." Semmes did go back and did do everything that was required of him. Is not this a certain bargain? Is anything necessary to make it complete and definite? And was it not performed by Semmes? Worthington agreed to leave him his place.

If the contracting parties are clearly named, the consideration sufficient and plainly expressed, and the subject-matter distinctly declared and proved, what more is necessary to make a contract certain? In a case of this kind reasonable certainty as to the fact and terms of it are all that Equity requires. Any other degree of certainty in such a case is unattainable. *Neale vs. Neales*, 9 *Wallace*, 1; *Lester vs. Foxcroft*, 1 *Leading Cases in Equity*, 630; *Mundy vs. Joliffe*, 5 *Mylne & Craig*, 177.

It was mutual—"Mutuality of a contract means an obligation on each party to do or permit to be done something in consideration of the act or promise of the other. It does not imply that every stipulation is absolute and unqualified." *Spear vs. Orendorf,* ·26 *Md.,* 43.

Here, so soon as Semmes accepted Worthington's proposition, each of the contracting parties came under a valid obligation to the other. Semmes to take possession and manage and cultivate the farm during Worthington's life, and Worthington in consideration thereof to devise it to Semmes. Both were bound. If Semmes had violated his engagement, would he not have been liable for its breach?

Independently of the Statute of Frauds, the contract as alleged is clearly proved.

There is not a particle of evidence tending to disprove it.

It is supported by a consideration not merely sufficient, but abundant.

It possesses all the ingredients essential in such a case, viz: it is fair, just, reasonable, certain in all its parts and mutual.

If it were evidenced by a writing,·a decree enforcing it would be a matter of course. *Smoot vs. Rea & Andrews,* 19 *Md.,* 405 ; 2 *Story's Eq. Jur., sec.* 751.

Not being in writing, however, and the Statute of Frauds being interposed as a defence, the complainant relies on part performance to take his case from the operation of the Statute.

Is the proof of part performance clear and definite? and is such part performance exclusively referrible to the identical contract set up?

When Worthington sent Nicholas and Schwartz after Semmes with his proposal, Semmes *had left the farm. His connection with it, and the affairs of his uncle had wholly ceased,* and nothing remained to be done but to make an

inventory and appraisement of the personal property, in order that a settlement might the more readily be had between them. Slade had arrived with his family, and taken possession—and Semmes was preparing to go to the West. Up to the time of his departure Semmes had been cultivating the farm for his uncle as a sort of tenant upon shares—his uncle receiving a clear one-half of the crops, &c., and Semmes paying all the expenses of carrying on the farm, including his uncle's board and lodging, out of the other half.

After his uncle's new proposition was communicated to him, and the new bargain entered into between them, Semmes *returned to the farm.* Possession was delivered to him by Mr. Worthington, and he assumed control at once. This has always been considered as "a strong and marked circumstance." *Wills vs. Stradling,* 3 *Vesey,* 378; *Browne on Statute of Frauds,* sec. 467.

He remained in possession continuously until Mr. Worthington's death, which happened in March, 1870—complying faithfully in all respects with his obligations under his new contract. He, moreover, paid to Slade out of his own means the $100 in money and provisions, for which Slade agreed that he would vacate the premises.

The proof upon both these points is uncontradicted, clear and definite. He performed fully everything that was required of him by the terms of the compact. He accepted the proposal; agreed to do what it exacted; did do it to the letter; and was ready and willing to continue on fulfilling its terms when his uncle's death released him from its further burden. The acts of part performance relied on are, therefore, indisputably established.

Nor can they upon any analysis of the facts be referred to any other contract than the identical one set up.

He was not in possession when the contract was made, but took possession, says Nicholas, "under the agreement,

and only under such agreement." And, says Schwartz, "he would not come back upon any other terms."

Here there was no continuance of his former relations, but a new contract—and a fresh possession taken after an actual and notorious departure from the farm, by a return to it equally actual and notorious.

The case broadly differs, therefore, from that class of cases where a parol agreement for a lease or a sale alleged to have been made during the existence of the tenancy by the landlord with the tenant, is sought to be enforced by the tenant upon the ground of part performance, and where the Court refuses to grant the relief prayed, because the acts of part performance can be reasonably accounted for by the mere *continuance* of the character which the tenant *all along* filled, and be referred to a title distinct from the alleged agreement. *Rosenthal vs. Freeburger,* 26 *Md.,* 80; *Billingslea vs. Ward,* 33 *Md.,* 54; *Spear vs. Orendorf,* 26 *Md.,* 44–45; *Surcome vs. Pinniger,* 3 *De G. M. & G.,* 571; *Fry on Specific Performance,* 250–252.

Here, however, it is impossible to refer the acts of part performance to the old tenancy, for that had been determined. Nor to a new tenancy distinct from the agreement, because the evidence establishes that the new occupation was solely "upon the foot of the new agreement"—and that Semmes was "not a tenant."

There is nothing ambiguous or equivocal in the acts relied on. They are capable of but one construction. But for this new contract, Semmes would not have returned to the farm and conducted it as he did until his uncle's death, but would have gone West. His reluctance to return was overcome solely by the value of the prize which under the contract was distinctly promised to him.

To deny to him now the benefit of his fair bargain while retaining the consideration which was asked from and rendered by him, is to perpetrate a fraud upon him. *Md. Savings Ins. vs. Schroeder,* 8 *G. & J.,* 93; *Moale vs.*

*Buchanan,* 11 *G. & J.,* 324; *Loffus vs. Maw,* 3 *Giffard,* 595 ; *Smith's Manual of Equity,* 253, 595 ; *Loxley vs. Heath,* 27 *Beav.,* 532, *&c.* ; *Laver vs. Fielder,* 32 *Beavan,* 12.

*Fielder C. Slingluff, Arthur W. Machen* and *Thomas Donaldson,* for Worthington and others.

There is no evidence of such acts of part performance, unequivocally pointing to the contract set up, and unsusceptible of other explanation, as to remove the bar of the Statute of Frauds. The proved and acknowledged relation of landlord and tenant accounts for every fact. *Frame vs. Dawson,* 14 *Ves.,* 387.

It is undeniable in the present case, that the complainant on his return to the farm became tenant again upon the same terms as before ; that he occupied and cultivated the farm as tenant—paid rent as tenant. That relation determined in all respects the character of his occupation. Whether the alleged agreement existed or did not exist, makes no visible difference. His occupation was of precisely the same nature before he quitted the farm that it was after his return to it. He held before in accordance with the terms expressed in the old written lease made with Schwartz He holds it subsequently, and down to, and after his uncle's death upon the same conditions, and governed by the same Schwartz lease. During the previous period no agreement to devise existed, as Nicholas acknowledges. How then *can* that occupation be considered as necessarily referrible to the agreement in question?

The test is, was the complainant's occupation such as to make him a *trespasser,* if we suppose that the alleged agreement did not exist. 1 *White & Tud. Lead. Cases,* 630, 631, *(marg.) note to Lester vs. Foxcroft, and the passage from Lord* REDESDALE'S *opinion there quoted;* 2 *Story Eq. Jur.,* secs. 760–4 ; *Bunton vs. Smith,* 40 *N. H.,* 353.

As to the payment of $100 to Slade, (even if it be assumed that Semmes furnished the money,) he can be fully recompensed by money. Payment of money never amounts to part performance in equity. This is now the settled doctrine : and the ground is that Equity only interferes at all to prevent fraud. 1 *White & Tud. L. C.*, 630, (marg.) 731 *in American note to Lester vs. Foxcroft* ; *Hughes vs. Morris*, 2 De G. Mac. & G., 356 ; *Hamilton vs. Jones*, 3 G. & J., 127 ; *Parkhurst vs. Van Cortlandt*, 1 *Johns. Ch.*, 284.

But even this payment is fully explained by the uncontroverted facts. It arose out of circumstances independent of the alleged agreement, and was the result of a compromise between two tenants disputing about the possession. Certainly there is nothing either in the fact of such a payment being made, under the circumstances in evidence, nor in the amount paid, to indicate that it was the consideration given for the reversion in fee to a great estate. Unless the principle that the acts relied on as part performance must be such as to point *of themselves* to the identical contract which is set up—be circumstantial evidence of it—be inflexibly adhered to, the Statute of Frauds is indeed overruled, and all the protection it was designed to afford, utterly broken down. *Chesapeake & Ohio Canal Co. vs. Young*, 3 *Md.*, 490 ; *Rosenthal vs. Freeburger*, 26 *Md.*, 80.

The acts cannot be taken as part performance if they "may be *accounted for* upon grounds other than those of the contract alleged." *Smith vs. Crandall*, 20 *Md.*, 482, 501 ; *Owings vs. Baldwin*, 1 *Md. Ch. Dec.*, 125, and 8 *Gill*, 338, 356 ; *Billingslea vs. Ward*, 33 *Md.*, 52.

The circumstance that a tenant, after a suspension of occupation, and before his accounts are adjusted, resumes possession upon the same terms as to occupation, cultivation and rent as at first, has no *tendency* to prove any collateral agreement. Still less can it be considered as

pointing to the special agreement here contended for, that is to say, an agreement comprehending two distinct ingredients, viz: first, a substitution of tenancy of life for the old holding from year to year; and secondly, a purchase of the reversion. All outward and visible circumstances being the same as those which lately resulted from the original tenancy, and that tenancy being renewed, nothing else is indicated. 2 *Story Eq.*, secs. 762, 763; *Beard vs. Linthicum*, 1 *Md. Ch. Dec.*, 348.

The contract is not proven. The proof should be *clear.* An agreement vague and uncertain in its terms will not be specifically executed, even if it be in writing. *Myers vs. Forbes*, 24 *Md.*, 598; *King's Heirs vs. Thompson*, 9 *Pet.*, 204, 218. *A fortiori*, if the evidence be unwritten; for then the uncertainty is multiplied—the imperfect and doubtful character of the proof adding to the difficulties arising out of the contract itself. *Wingate vs. Dail*, 2 *H. & J.*, 76; *Hall vs. Hall*, 1 *Gill*, 383; *Stoddert vs. Bowie's Exec'r*, 5 *Md.*, 18.

The nature of the supposed contract must be regarded. "*Agreements to devise* are to be dealt with no less strictly in equity than other contracts within the Statute of Frauds. Indeed, there are considerations which should subject them to a *more* rigid application of the Statute." *Mundorff vs. Kilbourn*, 4 *Md.*, 463.

In this case the great improbability that Mr. Worthington should have entered into such a contract, and the extreme disproportion between anything that can be conceived of as a consideration moving towards him, and the value of what he is supposed to have offered so lightly, cannot be lost sight of.

At most the evidence shows no more than the case—a very common one—of a promise for the performance of which the promisee relied on the honor or good feeling of the promisor—a promise of the kind illustrated in *Maunsell vs. White*, 7 *Irish Equity R.*, 413, before Sugden, L.

*C.*, whose decree was affirmed by the House of Lords, 4 *Ho. Lds. Cas.*, 1039.

Is it conceivable that a person of Mr. Worthington's character consented to reduce himself to the situation of a tenant for life in his own land? This goes far beyond the case of a father tieing his hands in favor of a son. The plaintiff was not only not a son, but not the heir, nor one of the heirs of the testator. In case of intestacy, he would not have succeeded to a dollar of the property. He had not the slightest legal claim upon his uncle; nor was there any moral obligation. He had come to him penniless, had been received with kindness, and allowed not only to farm the land, as Schwartz had been, but supplied, as Schwartz was not, with stock and capital to work it; and was not required to pay any more rent than Schwartz had paid for the use of the land alone. See *Waters vs. Howard,* 1 *Md. Ch. Dec.,* 115, and 8 *Gill,* 262, 277.

The alleged agreement is altogether indefinite. Upon the complainant's own showing, the contracting parties did not treat together directly, but the terms of the agreement are to be derived from disjointed declarations of Mr. Worthington, or the vague and uncertain recollection of persons who passed between them. It is not in this way that the Court can be assured that Mr. Worthington intended to assume an obligation of so momentous a character, and to divest himself, in substance, of the title to by far the larger part of his estate.

The bill states that one term of the agreement was that the complainant undertook to cultivate the farm *during the life-time of his uncle.* But there is not a particle of evidence that Semmes entered into any such obligation. There is nothing whatever to show that Semmes was not perfectly free to go or stay as he pleased, subject to the responsibilities of an annual tenancy. Again, there is nothing in the evidence to show that Mr. Worthington

promised, under any circumstances, to give Semmes the land *in fee.* Giving the utmost effect to his expressions— even as reported by Mr. Nicholas—they would be gratified by an estate during life.

So, as to the subject-matter of the gift there is almost equal uncertainty. One witness says, "Bloomfield," the other "the place." The plaintiff himself produces the will of 1868 as evidence of Mr. Worthington's original intentions in his favor. And the terms of that will do not coincide with any version of the alleged proposal. *Waters vs. Howard,* 1 *Md. Ch. Dec.,* 118.

To justify the interference of Equity the agreement should appear to have been *mutual.* But upon all the proof Semmes bound himself to nothing beyond the common obligations of a tenancy from year to year. *Gelston vs. Sigmund,* 27 *Md.,* 343, 344; *Billingslea vs. Ward,* 33 *Md.,* 48; *Duvall vs Myers,* 2 *Md. Ch. Dec.,* 401, 405; *Tyson vs. Watts,* 1 *Md. Ch. Dec.,* 15; *Dorsey vs. Packwood,* 12 *How.,* 136, 137; *Marble Co vs. Ripley,* 10 *Wall.,* 359; *Simmons vs. Hill,* 4 *H. & McH.,* 252.

Some reasonable *consideration* should appear. But here there is hardly so much as the colorable semblance of a consideration. Mr. Worthington promises all, and receives nothing. *Black vs. Cord,* 2 *H. & G.,* 100; *Geiger vs. Green,* 4 *Gill,* 475.

A decree for specific performance is not *ex debito justitiœ.* It is the settled doctrine in Maryland "that even if a contract is sufficiently established or admitted, it still remains with a Court of Equity as matter of sound discretion, whether under the circumstances, they will decree the specific performance." *Waters vs. Howard,* 8 *Gill,* 283; *Wadsworth vs. Manning,* 4 *Md.,* 70; *Oxford vs. Provand,* 2 *P. C. Appeals,* 151, (*L. R.*)

The claim of the complainant is most improbable, the proof of it doubtful, the known and undisputed facts do not support it, and every act of supposed part performance is otherwise explained.

Mrs. Milnor, whose testimony was excluded by the Court below, was a competent witness. Her interest under the last will of Richard J. Worthington is not such as would disqualify her *at common law.* She has no more than a bare and remote possibility, dependent upon the contingency of the dying in her life-time, and without issue, of two other persons. The interest that excludes must be fixed and certain: a remote and contingent interest never made a witness incompetent. · *Mitchell vs. Clagett*, 9 *Md.*, 51; *Melvin vs. Melvin*, 6 *Md.*, 541; *Reynolds, &c. vs. Manning, &c.*, 15 *Md.*, 510; *Falls vs. Belknap*, 1 *Johns. R.*, 491; *Hawes vs. Humphrey*, 9 *Pick.*, 358; *Galbraith's Lessee vs. Scott*, 2 *Dallas*, 95.

Mrs. Milnor *renounced* the *executorship* and never acted; which prevents objection on that account. *Alexander vs. Totter*, 8 *Jur.*, 418.

But the Code would make her competent, if she were not so at any rate. The exception created by the Act of 1868, ch. 116, does not affect *devisees.* There is no reason why it should, unless on the ground of interest; and mere interest as a cause of disqualification is removed by the 1st section of the Act of 1864. In *Johnson vs. Heald*, 33 *Md.*, 352, the devisees all testified, and without objection on that ground. To carry the exception to the general rule abolishing the disqualification of interest beyond the letter of the statute, would be extremely inconvenient in its consequences, and defeat the general policy of the present law of Evidence. A party to the contract on the one side, and the executor on the other, (where he is party to the litigation *as executor*,) are excluded; but devisees and legatees are competent. *Schull vs. Murray*, 32 *Md.*, 17; *Jones vs. Jones*, 36 *Md.*, 448; *Denison vs. Denison*, 35 *Md.*, 381.

ALVEY, J., delivered the opinion of the Court.

The bill in this case was filed for the purpose of procuring the specific execution of an alleged contract,

whereby the late Richard J. Worthington, deceased, agreed, in consideration of certain conduct and services to be performed by the plaintiff, to devise to the latter certain real estate, known as the " Bloomfield Farm and Race Course."

The bill alleges that, in the fall of 1866, the plaintiff was requested by his uncle, the late Richard J. Worthington, to take possession of his real estate, known as the " Bloomfield Farm and Race Course," containing about twelve hundred acres of land, more or less, and to work and manage the same *as a tenant*, upon the agreement and understanding that the profits should be equally divided between them ; that the plaintiff did take possession of the farm, and cultivate the same under the agreement, until some time in the month of April, 1869 ; that during this period the uncle repeatedly assured the plaintiff that he would devise the farm to him ; and that the uncle did execute a will on the 29th of January, 1868, whereby he devised to the plaintiff an equitable life estate in an undivided half of the farm. That subsequently, and after the occurrence of a disagreement between the uncle and the plaintiff, this will of the 29th of January, 1868, was cancelled, and another will, dated the 21st of January, 1869, was executed, wherein no provision whatever was made for the plaintiff. It is then alleged, that the plaintiff remained in charge of the farm until some time in April, 1869, when, in consequence of the disagreement between himself and his uncle, the agreement between them was rescinded, and the plaintiff vacated the farm ; that the uncle thereupon employed a man by the name of Slade, to work and cultivate the farm in the place of the plaintiff, but soon becoming dissatisfied with Slade, and being desirous to re-establish friendly relations with the plaintiff, and to secure his services upon the farm, he opened negotiations with the plaintiff, proposing that if the latter would pay to Slade the money necessary to

induce him to vacate the farm, and would moreover again take possession of and cultivate the farm during the lifetime of the uncle, he, the uncle, would devise the farm to the plaintiff. To this proposition, as it is alleged, the plaintiff, being unwilling again to subject himself to the whims and caprices of the uncle, at first positively refused to accede, but finally, after further negotiation, consented, being greatly influenced by the fact that from 1866 to 1869, he had, in reliance upon the assurance of the uncle, that the farm should be devised to him, expended upon the same all of his share of the crops and profits thereof; and that it was thereupon clearly, definitely and distinctly agreed between the plaintiff and his uncle, that the former should pay out of his own proper means such sum as Slade might exact as the price of relinquishing possession of the farm, and should himself take possession thereof, and manage, work and cultivate the same, paying to his uncle the clear one-half of the profits thereof, and with the other half, or so much thereof as might be necessary, defray the expenses of carrying on the farm during the life-time of his uncle; and, in consideration of his so doing, the uncle would devise the farm to him. It is further alleged that the plaintiff did induce Slade to vacate the farm, upon the payment to him of one hundred dollars, and did enter into possession of the farm, and in all respects performed his part of the agreement until the death of the uncle, which occurred on the 13th of March, 1870, less than one year from the date of the agreement.

It is further alleged, that the plaintiff was aware of the existence of the will of the 21st of January, 1869, at the time of entering into the agreement with the uncle, but that he did not know until after the uncle's death that the latter had failed to revoke it, as he had frequently declared his purpose so to do, and to make his will conform to the agreement with the plaintiff.

With the bill are exhibited the cancelled will of the 29th of January, 1868, and also the last will of the 21st of January, 1869, which has been admitted to probate.

By the cancelled will the testator gave to the plaintiff an equitable life estate in one-half of the real estate in controversy, with other property, and appointed him one of his executors. And by the last will no provision is made for the plaintiff at all, but the real estate in question is devised to one of the testator's brothers, in trust for the use of two grand-nieces, and in the event of their dying without issue living, then to a niece, Mrs. Susan J. Milnor, in fee.

The adult defendants, by their answers, deny the existence of the contract and part performance thereof, as charged in the bill, and, consequently the plaintiff is put to full proof of his case. The contract alleged is evidenced by no writing whatever, but rests entirely on parol as contradistinguished from writing. The Statute of Frauds has not been invoked or relied on by the defendants in their answers; but where a parol contract, within the Statute, is set up by the plaintiff, and the defendant by his answer denies the making of the contract, it is not necessary for him to plead the Statute or insist on it as a bar; but the plaintiff, in order to entitle himself to the relief prayed, must, at the hearing, fully establish the contract as alleged, and such acts of part performance thereof as will take the case out of the Statute. *Billingslea vs. Ward,* 33 *Md.,* 48.

The Court below was brought to the conclusion that the contract alleged was sufficiently established and partly performed as to part of the real estate mentioned in the bill, and decreed execution accordingly, by appointing a trustee to convey such part to the plaintiff. From this decree there have been cross-appeals; and the whole case has been most fully and ably argued at the bar of this Court by the solicitors of the respective parties.

That a contract to devise real estate, if shown to be in all respects fair, just and reasonable, founded on sufficient consideration, and there be no doubt on the proof as to any of its terms, may be enforced by specific performance, by way of conveyance, as against the heirs or devisees of the party obligating himself to devise, is a proposition fully sustained by authority, and we do not understand that such proposition is at all controverted in this case. But in all cases for specific performance the contract must be accurately stated in the bill, and the proof must in every essential particular correspond with the terms of the contract thus set up. The proof must be clear and explicit, leaving no room for reasonable doubt. And in cases for the specific enforcement of a contract to devise, like the present, where the property has been devised to other parties, the utmost certainty is required, as, by the enforcement of the contract, the Court undertakes to set aside a solemn testamentary act of the deceased party, in the absence of all possible explanation of his conduct, and when he is no longer present to vindicate himself against the imputation of bad faith. To such cases may well and most aptly be applied the rule so clearly and forcibly stated by the late Mr. Justice GRIER, of the Supreme Court, in delivering the opinion of that tribunal, in a case of an application for specific performance. In speaking of the character and certainty of proof required on such applications, he said: "Such proof must be clear, definite and conclusive, and must show a contract leaving no *jus deliberandi* or *locus penitentiæ*. It cannot be made out by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversations, which the witness had no reason to recollect from interest in the subject-matter, which may have been imperfectly heard or inaccurately remembered, perverted or altogether fabricated; testimony, therefore, impossible to be contradicted." *Purcell vs. Miner*, 4

Semmes *vs.* Worthington, *et al.*

*Wall.,* 517. And in this case, without intending in the slightest degree to question the integrity and good faith of any witness examined in the cause, it is proper to observe and bear in mind, that all the evidence offered to establish the contract, consists of the mere verbal declarations and statements of the deceased, and that the witnesses who depose to them had no other means of identifying the expressions used, or the intention of the declarant, than their mere power of recollection after the lapse of a considerable time. The wisdom of the Statute of Frauds, in requiring contracts of great importance to be evidenced by writing, is within the constant experience and observation of every one engaged in the administration of justice; and it has been a matter of regret by the ablest Judges that the provisions of that Statute should ever have been so far relaxed, as to allow the titles of parties to their estates to depend in any considerable degree upon the chances, the uncertainty and imperfections of human memory, to say nothing of their great exposure to fraud and perjury. As, however, the Statute has in some cases been relaxed, and its literal and strict provisions departed from in order to prevent fraud, the rule established as applicable to those exceptional cases must be observed; the Court, however, requiring in all such cases full and complete proof, as to all the conditions upon which the bar of the Statute can be removed.

In this case, seeing to what standard the proof must be measured, we are of opinion that the plaintiff has failed to relieve his case of all rational doubt as to the factum of the contract alleged. That there were hopes raised and expectations created on the part of the plaintiff, by the conduct and declarations of the deceased, the evidence abundantly shows; but that they assumed the solemn form and obligation of a distinct and definite contract in respect to the devise of the farm, we think may and does admit of serious question. The plaintiff

had occupied the estate from 1866, to April, 1869, as tenant on the usual terms of leasing. The estate was large and valuable, supposed to be worth over one hundred thousand dollars ; and the plaintiff being poor and without a cent to apply to the stocking of the farm, his uncle furnished all the stock and utensils, and exacted only the rent paid by his former tenant Schwartz. Upon some disagreement with his uncle, the plaintiff left the farm in April, 1869, in the midst of a current year of his tenancy, and was succeeded in its occupation by Slade, but for a few days only. By the fault of which of the parties the disagreement occurred does not appear ; but by the intervention and upon the suggestion of mutual friends a reconciliation was effected, and the plaintiff was again placed in possession of the farm as before. It is manifest from the evidence that the idea of this reconciliation, and the restoration of the plaintiff to the possession of the farm, did not originate with the uncle, but would appear to have been conceived and proposed by Schwartz, Nicholas and Bosley. They stopped the appraisement which they were called on to make, and proposed that one of them should go to Worthington, the uncle, and ascertain whether he was willing that the plaintiff should return to the farm, and, upon his signifying assent, arrangements were initiated to get Slade to vacate and the plaintiff to resume the possession of the farm as formerly. This fact is proved by Schwartz, one of the plaintiff's witnesses. The payment of the hundred dollars to Slade to induce him to surrender possession, appears to have been made only in part by the plaintiff ; but the surrender was manifestly for the benefit of the plaintiff, as thereby he was not only restored to the possession of the farm, but to the benefit of his winter's work done on the farm, and of the crop then growing. He might well, therefore, agree to pay the hundred dollars for the surrender of the farm.

The two witnesses upon whose testimony the main reliance is placed to establish the making of the contract as charged in the bill, are Nicholas and Schwartz. The first named of these witnesses, says: "Mr. Worthington sent down for me specially to come up there; I had been one of the appraisers to appraise the property. When I went up there, Mr. Worthington told me that, as I had started this business, I must get Charles Semmes back, and Frank Slade away; that if Charles Semmes would come back and attend to his business as he had done before he went away, that he, Worthington, would leave him Bloomfield at his death, and if he didn't, he should never see a damned cent of his property." This proposition according to the testimony of the witness, was submitted to the plaintiff, who, after considerable difficulty, was induced to accede to it. Schwartz, the other witness, testified that Worthington told him "to tell Charles Semmes that if he wouldn't come back and attend to his work like he did before, he shouldn't have a damned cent, and if he would come back he would give him the place." This proposition was also taken to the plaintiff by the witness, and it was not until after considerable hesitation that the plaintiff finally acceded to it, and returned to the farm. Neither of these witnesses as will be observed, profess to give the exact language of the deceased, nor everything that was said by him; nor do they undertake to state the language of the plaintiff when these propositions were made to him, to show how he understood and in what sense he accepted them. These are the only two witnesses who profess to have any knowledge of the making of the contract; the other witnesses for the plaintiff testifying to declarations of the deceased, all of which are of a vague and indefinite character as evidence of a contract, such as that set up in the plaintiff's bill.

Now, without laying any particular stress on the discrepancy between the contract as alleged in the bill, and the evidence offered in proof of it, which is much more than merely verbal, is it rational to conclude, in view of all the circumstances of the case, that the deceased intended to make a binding and conclusive contract for the final disposition of the estate in question, as contended by the plaintiff's counsel? To justify such a conclusion the most positive and unequivocal proof should be furnished; as the effect of such contract, if made, was not only to revoke the solemn last will and testament of the deceased, as to the estate in question, consisting at least of two-thirds of his entire estate, but forever to deprive him of all power of disposition over it, and to reduce him to the condition of a mere life annuitant, depending for the amount to be received upon the skill and attention with which the estate might be managed by the plaintiff. By the contract as attempted to be established, the plaintiff became entitled to the devise upon his taking possession and cultivating the farm during the life of his uncle, upon the same terms and in the same manner as before, when merely a tenant, without any reference whatever to the possible change of feeling, or to any future relation that might exist between them. For this extraordinary contract, the only apparent consideration to the deceased, was the preference of one tenant to another to cultivate and manage his estate, on being paid the usual rent. And it is really difficult to imagine that a sensible man, as the deceased is said to have been, would, by solemn contract on such consideration, so entirely denude himself of all power and control over his estate, and place himself in a condition of such dependence in reference to it.

But turning to the conduct of the plaintiff, how did he understand the transaction between himself and his uncle? Did he understand from the beginning that it was a bind-

ing and conclusive contract that would secure to him, absolutely and unconditionally the farm, upon his remaining on it and cultivating it as tenant during the life-time of his uncle? With such understanding of it, it was certainly strange that he should have had reluctance in regard to accepting the offer, and entering into the contract; he, a young man and poor, and his uncle far advanced in years. If such was his understanding of the matter, there existed every incentive for having the contract reduced to writing. In his bill he characterizes his uncle as a man of whims and caprices, and by the proof he has shown him to have been changeable and perverse in his disposition; and therefore his declared intents and purposes were not to be relied on. He knew, moreover, according to the allegation of his bill; that his uncle had revoked the will of January, 1868, in which he was provided for, and had made the will of January, 1869, under circumstances that gave him no reason to hope for a provision; and with this knowledge he has not alleged or attempted to prove, that he ever on any occasion inquired of his uncle whether he had made or intended to make his will conform to the alleged contract, or requested him to do so. This would have been but a proper precaution, and quite natural to one who had reluctantly entered upon the performance of a binding contract of the grave importance of the one in question. He knew, or should have known, that the contract without writing was no sufficient security to him. He could have had no delicacy upon the subject; it was no longer a mere question of option and bounty on the part of the uncle, according to the pretension now set up, but was a question of absolute right in the plaintiff which he should have been forward to assert. But, instead of asserting his right under the contract, will or no will, his own declarations both before and after the death of his uncle would seem to be quite inconsistent with the

claim now made.   According to the testimony of several of the witnesses, the plaintiff meditated leaving the farm at the end of the year 1869.   He told Mrs. Milnor, his sister, in the summer of 1869, that he expected to leave Bloomfield as soon as he got in his crops.   In the summer before the death of his uncle, he told Clara Madden, ''that he didn't expect his uncle Dick would give him anything;'' and after the death, and before the will of the deceased was produced, he said to Mrs. Milnor and also to Clara Madden, that he did not expect to get anything by the will.   Such would hardly have been his language, if he had been relying upon a positive contract, determining his rights, and leaving his uncle no option as to the manner of disposing of his farm.   At least, associated with such language would likely have been some reference to, or assertion of, his claim under the contract.   But no such reference or assertion appears to have been made by him.

The competency of Mrs. Milnor as a witness has been excepted to, on the ground that she is a party to the suit for the enforcement of a contract against a deceased party's estate, and that she is interested in the subject-matter in controversy.   But there is nothing in the Evidence Acts of 1864 and 1868, that would exclude her, not being within the exceptions of those Acts; and her interest being altogether contingent and remote, she would be competent even according to the common law rule of evidence.   The exception therefore cannot prevail.

Then, upon the whole evidence bearing upon the question of the existence of the alleged contract, without entering further into the details of it, and laying out of view the declarations of the deceased which have been excepted to by the plaintiff, we are not satisfied, to the exclusion of all rational doubt, as to the making of the contract or the real understanding and intention of the

parties. Some of the facts proved do certainly give the semblance of a contract; but the circumstances of the case are exceedingly cogent to justify the belief that, according to the understanding of the parties themselves, what occurred between them in reference to the devise of the farm, amounted to nothing more than mere inducement and expectation, uncoupled with anything like positive and binding obligation. The conduct of both parties would seem to consist with this idea of their understanding. That there has been disappointment on the part of the plaintiff is most probable, but whether there has been bad faith, amounting to breach of contract on the part of the deceased, the record before us does not in our opinion, justify us in declaring.

But if we could surmount the doubt in regard to the existence of the contract, and conclude that it was established with sufficient certainty, we should then be brought to the question, whether the contract is of a character to be specifically enforced by a Court of Equity. Specific execution of contracts by Courts of Equity is not a matter of absolute right in the party applying, but of sound discretion in the Court, to be exercised upon consideration of all the circumstances of each particular case. The Court will be controlled, of course, in the exercise of its discretion, by the established doctrines and settled principles upon the subject; but it does not follow, as matter of course, that because the legal obligation under the contract may be perfect, therefore the equitable power of the Court will be exercised to compel or effect specific execution. In every case, the question is, whether the exercise of the power is called for to subserve the ends of justice; and unless the Court is satisfied that the application to it, for this extraordinary assistance, is fair, just and reasonable, *in every respect*, it will refuse to interfere, and leave the party to other remedies for redress. *Waters vs. Howard*, 1 *Md. Ch. Dec.*, 112; *S. C.*, 8 *Gill*, 262; 2

*Sto. Eq. Jur.*, secs. 767, 770 ; *Seymour vs. Delancey*, 6 *John. Ch. Rep.*, 222 ; *Willard vs. Tayloe*, 8 *Wall.*, 557.

Here, upon the assumption that the contract was sufficiently established, we think it exceedingly questionable whether, upon settled principle, a Court of Equity would be warranted in lending its assistance. There would seem to be an absence of those equitable elements that commend a contract for specific execution. To say that such contract as is here alleged is in all respects equal, just and reasonable, in view of all the facts of the case, would be saying what no known precedent justifies, and what it would be difficult in reason to prove.

But if we could come to the conclusion that a contract had been established by the evidence, and waiving this last objection to its specific execution, there would still remain an insuperable difficulty to its specific performance by a decree of a Court of Equity, and that is the bar of the Statute of Frauds. The acts, alleged to be in part performance of the contract, and relied on to relieve it of the operation of the Statute, are, in our opinion, wholly insufficient for that purpose. The only act in this case that can have any significance whatever as being in part performance of the alleged contract, is that of possession. But the partial and subordinate possession that was held by the plaintiff, under the peculiar circumstances of the case, was, to make the most of it, an equivocal act, susceptible of a variety of interpretations, and affording no evidence or presumption whatever of the particular contract alleged, and to allow such act, even if the contract were otherwise established, to remove the bar of the Statute would operate a virtual repeal of it as applied to cases like the present, and let in all the mischief that was intended to be guarded against by the Statute. The principle upon this subject is well established. The act relied on as part performance must, in itself furnish evidence of the identity of the contract; and it is not enough that it

is evidence of some agreement, but it *must relate to and be unequivocal evidence of the particular agreement charged in the bill.* *Ches. & Ohio Canal Co. vs. Young*, 3 *Md.*, 480. And the Court is never anxious to grasp at slight circumstances to rescue a case from the operation of the Statute, nor does it indulge in any latitude of construction, where there is any equivocation or uncertainty in the case presented. It adopts the rule that the contract should be clear and definite, and that the acts done should be equally clear and definite and solely with a view to the performance of the particular agreement. *Shepherd vs. Bevin*, 9 *Gill*, 32. The acts done must be of a substantial nature, and such, that the party would suffer an injury amounting to a *fraud* by the refusal to execute the agreement. *Frame vs. Dawson*, 14 *Ves.*, 387. This is the ground upon which Courts of Equity interpose their aid, in cases of clear part performance of verbal agreements. *Hamilton vs. Jones*, 3 *Gill & John.*, 127 ; *Hall vs. Hall*, 1 *Gill*, 387 ; *Caldwell vs. Carrington's Heirs*, 9 *Pet.*, 86. But the acts done in this case, in the alleged part performance of the contract set up in the bill, if the contract were proved, were not of a character to make it fraudulent on the part of the defendants to rely on the Statute of Frauds as a bar to the plaintiff's case. Though it is alleged in the bill, it is not proved as a fact that the plaintiff made expenditures or improvements on the land on the faith of the alleged contract ; and the mere possession, such as it was, under the particular circumstances, could afford no sufficient ground for relieving the case from the bar of the Statute of Frauds.

In the opinion of the Court, the plaintiff has failed to establish his case, and consequently the decree of the Court below must be reversed, and the bill of complaint dismissed, with costs to the defendants.

*Decree reversed, and*
*bill dismissed.*

(Decided 2nd July, 1873.)

MILLER, J., delivered the following separate opinion:

I rest my assent to the reversal of this decree upon the sole ground that the agreement set up in the bill is not established by the requisite degree of proof. Fully concurring in and assenting to every thing said in the opinion of the Court, delivered by my Brother ALVEY, as to the necessity of clear and undoubted proof of the contract in a case like the present, I am of opinion that if the contract were thus established there would be no difficulty in decreeing its specific execution. In that case, taking possession by the nephew after the abandonment by him of the relation of landlord and tenant previously existing between him and his uncle, could be referred to that agreement and nothing else. It would be possession under it and not under the previous tenancy. Assuming the averments of the bill, that in consequence of a misunderstanding between them, the nephew, in April, 1869, in the midst of a year of his tenancy, *abandoned* the farm, that all existing relations of landlord and tenant were by mutual consent annulled and rescinded, and another tenant in place of the nephew, engaged by the uncle and put on the place, and that, *after this,* there was a *contract* made between them, that if the nephew *would come back* and manage, work and cultivate the farm *during the life* of the uncle, paying to him one-half the clear profits thereof, the latter *would devise* the farm to the nephew, *to be proved,* I am unable to perceive how subsequent possession of the place by the nephew is not to be considered as part performance of *that contract,* so as to take the case out of the operation of the Statute of Frauds. Abandonment of the place, dissolution of existing relations, procuring and putting in possession a new tenant, and the coming back after this and taking possession again, are such "*other unequivocal circumstances,*" (2 *Story's Eq.,* sec. 763,) as point and refer the subsequent possession solely and exclusively to the contract, and not to the pre-

vious tenancy.   It is not like the case put by *Sir* WILLIAM
GRANT, in *Frame vs. Dawson,* 14 *Ves.,* 388: "Suppose
my tenant should set up an agreement for a purchase,
and get a witness to swear to it, and then offer as evidence
of part performance, his possession and cultivation of the
land, could that be deemed an act of part performance,
which would have existed precisely in the same shape,
whether there was any agreement for the purchase, or
not?"   In that case there was no interruption of posses-
sion, and the agreement set up by the tenant who remained
all the while in possession, was for an extension of the
lease for ten years, in consideration of the repair of a
party-wall.   It is clear that there the act of possession
was equivocal and could be referred to the existing ten-
ancy as well as to the alleged agreement.   But the rule
on this subject has been stated by this Court in the two
cases of *Spear vs. Orendorf,* 26 *Md.,* 37, and *Rosenthal vs.
Freeburger, Ibid.,* 75.   In both, the possession was *con-
tinuous,* and the alleged agreements were for renewed
leases.   In the former, the Court said, "It is abundantly
settled, that if one who is already in possession of land
as tenant, verbally contracts with the owner for a new
term, his *merely continuing* in possession after the making
of the alleged contract, is not an act of part performance
within the meaning of the rule, so as to justify a decree
for a lease according to the contract.   In such a case, the
*continued holding* is naturally and properly referrible to
the *old tenancy* and does not necessarily imply any new
agreement between the parties."   There must be some-
thing else besides mere continuance of possession, and
a majority of the Court there held that the averment in
the bill, that the tenant paid the increased rent of $1500
for the last year as part and parcel of the alleged agree-
ment, and in performance thereof, was equivalent to an
averment that the landlord accepted the additional rent
upon the foot of the agreement, and, therefore, author-

ized the granting of the injunction prayed for, and specific execution of the agreement, if established by proof. In the latter case there was mere continuance of possession by a tenant who claimed a lease for five years, under an alleged agreement with the purchaser of the reversion that he should become his permanent tenant, and there the Court held that possession insufficient as part performance, and say, "The appellee as tenant continued in possession after the purchase by the appellant. This is a mere continuance of the character which he *all along* filled, and any act which may be thus referred to a title distinct from the agreement, cannot be considered as taking the case out of the Statute." So in *Billingslea vs. Ward,* 33 *Md*, 48, there was a tenant in possession setting up a parol contract for the purchase of the land, and the Court, after stating that he was already in possession of the land previous to the alleged agreement, say, "Now it is evident that the possession of the appellee was not under or in execution of the alleged purchase, but began *before* such contract is alleged to have been made, under an entirely distinct contract as tenant, and *continued without any change or alteration in the mode of holding,* so far as is disclosed by the evidence down to the time of Richard Green's death."

The distinction between the possession in the present case, upon the assumption that the alleged contract is clearly proved, and that in the cases referred to, appears to me broad and indisputable. The language of the Court in those cases and in all the authorities referred to in them, seems to have been studiously guarded, and framed to meet precisely a case of this character, where the possession was *interrupted,* the previous tenancy completely ended, and possession again taken *after* the alleged contract was made. I have seen no case in which any Court has ever held or laid down a contrary doctrine.

But being satisfied upon a careful examination of all the testimony in the record applicable to the subject, that the alleged contract is not established by that clear and satisfactory proof, which is always required in such cases, I agree to the reversal of the decree and dismissal of the bill.