HILDA MAE MOATS ᴇᴛ ᴀʟ. *v.* THE ESTATE
OF LILY W. PUMPHREY ᴇᴛ ᴀʟ.

[No. 1303, September Term, 1975.]

*Decided September 17, 1976.*

The cause was argued before Fʀᴇᴅᴇʀɪᴄᴋ J. Sɪɴɢʟᴇʏ, Jʀ.,

and MARVIN H. SMITH, Associate Judges of the Court of Appeals, and DAVID ROSS, Associate Judge of the Eighth Judicial Circuit, all specially assigned.

*Steny H. Hoyer*, with whom were *Hoyer & Fannon* on the brief, for appellants.

*Jeffrey D. Radowich*, with whom were *Edward S. Digges, Sr.*, and *Edward S. Digges, Jr.*, on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

This case is a sequel to *Moats v. Schoch & Berry*, 24 Md. App. 453, 332 A. 2d 43 (1975), and was pending at the time that proceeding was before this court. In fact, Chief Judge Orth noted for the court in footnote 5 of the opinion in that case that the appellants there (two of the three appellants here) "moved to have further appellate proceedings stayed pending the outcome of Equity 3343 [(this case)] below," which motion was denied. We shall here invoke Maryland Rule 1086 and hold that "the judgment of the lower court [should] not be set aside on the evidence [since it was not] clearly erroneous . . . ."

The seeds of this controversy were sown in 1942 when Hilda Mae Pumphrey married contrary to the wishes of her parents. A day or two later they executed a will styled at the top as "Joint and Several Will of William B. Pumphrey and Lily W. Pumphrey." It provided in pertinent part:

"We, William B. Pumphrey and Lily W. Pumphrey, husband and wife, . . . do hereby make, publish and declare this to be our Joint and Several Last Will and Testament in manner and form following, that is to say: —

"After the payment of all our just debts . . . we dispose of our estate, jointly and individually, as follows: —

"*Item 1*: — We give and bequeath unto our daughter, Hilda Mae Pumphrey, the sum of one ($1.00) dollar.

"*Item 2*: — After the death of both of us, we jointly and severally bequeath and devise our home property containing 18.32 acres, more or less, ... unto our daughters, Frances Geneva Pumphrey and Lillie Belle Pumphrey, equally, share and share alike.

"*Item 3*: — We jointly and severally and individually bequeath and devise, after the death of both of us, the survivor having had a life interest therein, all the rest and residue of our estate, jointly and severally and individually, real, personal and mixed, of whatsoever kind and wheresoever located, and whether nor [sic] owned or hereafter acquired, unto our daughters, Frances Geneva Pumphrey, and Lillie Belle Pumphrey, equally, share and share alike.

"We hereby nominate, constitute and appoint our daughters, Frances Geneva Pumphrey, and Lillie Belle Pumphrey, executors of this our Joint and Several Last Will and Testament."

Mr. Pumphrey died in 1949. In 1957 Mrs. Pumphrey executed a new will. In it she left the residue of the estate, after bequests of $1.00 to each of her three daughters, to two granddaughters, the children of Lillie Belle Bastain. In the earlier appeal two of the daughters, Hilda Mae and Frances Geneva, sought to prevent the probate of the later will. In holding that the 1957 instrument was properly admitted to probate, Chief Judge Orth said for the court:

"We assume for the purpose of decision, but expressly do not decide, that it was a joint and mutual will,[6] contractual in nature, and that Lily W. Pumphrey accepted benefits thereunder. In other words, we are assuming *arguendo*, for the determination of this appeal only, that the will of 1942 was a joint, mutual, reciprocal will binding William and Lily to dispose of their property in the manner therein set out, each in consideration of the other, and that there was a contract between them

that the will would remain in effect. Even on these assumptions, which accept the premises in the question as presented by daughters, the answer to the question is no, the will of 1942 is not irrevocable.

---

"6. The courts have not been discriminate in defining the terms 'joint,' 'mutual,' and 'reciprocal' wills. We think the best definitions are those found in Vaughn, 'The Joint and Mutual Will,' 16 Bay L.R. 167 (1964):

'A joint will is a single testamentary instrument which contains the wills of two or more persons, is executed jointly by them, and disposes of property owned jointly, in common, or severally by them. A mutual will is one executed pursuant to an agreement between two or more persons to dispose of their property in a particular manner, each in consideration of the other. If the testators name each other as beneficiaries, the wills are reciprocal. Two or more wills may be mutual without being joint. A joint and mutual will must be the will of two or more persons contained in a single testamentary instrument, jointly executed by them pursuant to an agreement to dispose of their respective estates to each other or to third parties. Although the initial execution of the will may categorize it as joint and mutual; nevertheless, it cannot be given effect as such while one party survives, but, as to him, it will be given effect as his separate will.' (footnotes omitted)

See Annot., 169 A.L.R. 9, 12-14 (1947); G. Thompson, Wills, § 34 (3rd ed. 1947); 57 Am. Jur. Wills, § 681 [(now 79 Am. Jur.2d Wills § 754 (1975))]." Id. at 458-59.

In this case appellants Hilda Mae Moats (Hilda Mae), Frances Geneva Bell (Frances Geneva), and Lillie Belle Bastain (Lillie Belle) (collectively, the daughters), have sued the two granddaughters and the estate of Mrs. Pumphrey. Among other things, they have alleged:

"That prior to and concurrent with the execution of said will, [their parents] agreed and contracted, each with the other and in consideration of the promises made each to the other and to their daughters, to dispose of all of their separate and jointly held property, whether in hand or after acquired, in such manner that the survivor would obtain only a life interest therein, including

property owned solely by the survivor, with remainder to specified legatees and devisees, namely, their daughters, Frances Geneva Bell, Hilda Mae Moats and Lillie Belle Bastian [sic].

"That said agreement and contract was understood and consented to by both parties, and the terms thereof were reduced to writing and contained in the document dated May 22, 1942, and titled 'Joint and Several Will of William B. Pumphrey and Lilly [sic] W. Pumphrey' (marked as Exhibit A and attached [to the bill of complaint]), which document was intended to and did in fact serve as a binding written memorial of said agreement and contract, as well as the means by which performance of said agreement and contract would be insured as to both parties in the event of the death of the other."

They further alleged that by this will their mother "took only a life interest in the property of [their father], [with the] remainder to Frances Geneva Bell, and Lillie Belle Bastian [sic], and she did contract to leave her property, then held or after acquired, in accordance with the terms thereof"; that "[t]he parties contracted and agreed that upon the death of the first to die the survivor should take an ordinary life estate in all property belonging to either spouse at that time or thereafter acquired, and that [their mother] thereby became bound to create such an interest at the death of [their father] in all property belonging to her then or acquired later, and to make a gift of the remainder interest to her daughters in compliance with the agreement"; "[t]hat at the death of [their father], [their mother] acquired a life estate only in his property and simultaneously had her own fee interest in all jointly held, separate, and after acquired property, diminished, pursuant to the agreement and contract between them, to a life estate"; that at the death of their father they "acquired a *vested remainder interest* in fee simple in all property belonging to [their father], and in all property jointly owned

by [their father and mother] and in all property owned by [their mother] at that time or thereafter acquired by her and not disposed of *inter vivos*"; that at the death of their mother "and the termination of her life interest in all her property, whether separate, jointly held, or acquired subsequent to the death of [their father], the Plaintiffs' vested remainder interest became a vested fee simple interest in *all property* belonging to [their parents], whether separate, jointly held, or after acquired, and that, therefore, [their mother] was without power or authority to effect any valid testamentary disposition of any such property in violation of the agreement and contract described *supra*." (Emphasis in original.) They sought: (1) a declaration that the agreement between their parents as contained in the 1942 will was "valid and binding upon the Estate of Lily W. Pumphrey, deceased, . . . upon the Defendants in this action; and upon all other persons mentioned in or benefited by the said mutual Will"; (2) specific performance of the agreement; (3) that the 1957 will "be declared inoperative, illegal, and ineffective to devise, bequeath, give or dispose of any of the real or personal property which came into the hands of [their mother], on the death of [their father], or was thereafter acquired but not disposed of by her during her life, and that in such respect said alleged Last Will and Testament of [their mother] be declared null and void"; (4) an accounting of all property received by the co-executors under the 1957 will and surrender by them of all such property; (5) an injunction against sale or transfer of real or personal property in the possession of the co-executors; (6) the appointment of a receiver "for the purpose of taking possession of and protecting the property mentioned in [their] complaint," with the receiver to collect rents, etc.; and (7) a judgment for costs.

The chancellor (Bowling, J.) pointed out in his opinion that the earlier case in this court settled the fact that the 1942 will was revocable. Thus, he reasoned, "if the relief prayed is to be granted it must be based on an underlying agreement independent of the Will." He referred to *Wilks v. Burns*, 60 Md. 64 (1883), quoted extensively by this court in the earlier

opinion, and repeated that portion of the opinion in *Wilks* in which Judge Yellott said for the Court:

> "If a will executed under these circumstances, is subsequently cancelled, the aid of a Court of equity can be invoked. But how does equity intervene? By an inquiry into the terms of the contract, which must be established by the adduction of proper and adequate evidence. If the proof fails, there can be no application of the remedy, and the cancelled will remains without vitality." *Id.* at 70.

He said that in "review[ing] the terms of the Will and the facts in this case to determine whether an underlying agreement existed which would be enforcible [in equity]" it was necessary that "a determination should be made as to whether this is a 'joint and mutual' or a 'joint and several' Will," that if it were found that this was "a mutual Will it would be some evidence indicating that there was an independent, underlying agreement between Mr. and Mrs. Pumphrey for the disposition of their property." He pointed out that the words "joint and several" were used in the instrument, that "Websters' definition of several is 'existing apart, separate, distinct and individual,'" that there was "no other language in the Will which indicates that these words were to be given any meaning other than their normal and customary meaning," and thus concluded "that this was to be a joint and several Will and not a joint and mutual Will," that at the death of her husband in 1949 the will became the individual will of Mrs. Pumphrey "and she had the right as provided by statute to revoke the same at any time." He added that "[t]he disposition of property as provided in the Will does not show an independent, underlying agreement which would be binding upon Mrs. Pumphrey after the death of Mr. Pumphrey." He then went on "to determine whether or not there was extrinsic evidence sufficient to establish the existence of an underlying agreement which would preclude Mrs. Pumphrey from revoking this Will in 1957." He concluded there was no such evidence, that there was no underlying agreement

concerning the disposition of the property other than that both parents intended to punish Hilda for running off and getting married, and that "[t]he evidence disclose[d] no independent agreement for the disposition of their property in any other manner which would prevent Mrs. Pumphrey from revoking her 1942 Will in 1957."

The evidence adduced was sparse. All three daughters testified. Hilda Mae said that she had no contacts with her parents from the time that she called her mother after the ceremony on the day of her marriage until seven years later in 1949 when her father was in the hospital. She testified that her father operated a hog farm in Prince George's County and that when the hogs were sold her father "got two-thirds. [Her] mother received a third. They were partnerships."

Lillie Belle said that her father told her that if she "taken and walked off and got married like Hilda [she] would be left nothing or otherwise if [she] had stayed home and got married like [she] should that [she] would heir to everything that he had," that is that she and her sister, Frances, would be "made heirs of everything." This conversation took place on the night that Hilda was married. She stated that on the following day her father "said he was going to Upper Marlboro and they [we]re going to make a will" and "that Frances and [she] would be the heirs to whatever they had." On May 22, in the presence of her mother, she and her sister were handed the will and told to read it. At that time the discussion was with her father who "told [them] that there was a will and everything belonged to Frances and [Lillie Belle]." She identified the will we have quoted as the instrument which she read on that day. She testified to familiarity with the business operation of the family farm and that "when [her father] came home from selling these hogs [her mother] was given so much money, one third, and he kept the other two-thirds. In fact, he put his share in the bank."

The next witness was Frances Geneva. She was close to 16 at the time her older sister got married and left home in 1942. She said, "There was a lot of confusion and threats and

everything, what would happen if we did it and all." She testified relative to a conversation with her father:

> "He said if either one of you girls do that, you will get the same thing. We will leave her a dollar. We are going to have a will made and we are going to leave her a dollar."

On May 22, 1942, when she came home from school her mother and father showed her the will. She identified the document we have previously quoted as the instrument which she was shown. Relative to the conversation, she declared:

> "My father said well, we had a will made today. And my mother handed it to my oldest sister and we read it, because, you know, I was a child. I didn't pay too much attention to it."

John E. Kennedy described himself as a good friend of the family in 1942. At that time he saw Mr. Pumphrey "every day, five days a week. And family about twice. [He] guess[ed] about every other night through the week." He said that when Hilda ran away to get married her father "said that they were going to make a will," that "[h]e said they [we]re going to make a will, going down to Upper Marlboro, to make a will, and leave Hilda one dollar and the entire estate would go to Belle, which is the oldest daughter and Frances, the youngest daughter." This conversation took place on May 21, 1942, a date he "never will forget." According to Kennedy on the following day or two days later Mr. Pumphrey "and Mrs. Pumphrey told [him] that they made the will that day" and asked whether he "would like to read it." He said there was not much further conversation "with Mr. Pumphrey. Because he was very brief. He never said much. But Mrs. Pumphrey kept saying over and over . . . that they made the will and that Belle and, the oldest daughter, and Frances. The youngest one would get the entire estate. Hilda Mae would get one dollar."

The above testimony, the 1942 will, and a certified copy of the administration account in Mr. Pumphrey's estate

showing a gross personal estate of $3,945.04 and payment in excess of receipts of $294.78 constituted the evidence before the chancellor.

We review this case bearing in mind that in *Wilks*, 60 Md. at 67-68, the Court of Appeals said, "When there is an application for specific performance, the proof of the intention of the contracting parties must be clear, and the contract certain in its terms, and free from all shade or color of ambiguity." In that same case the Court quoted from *Semmes v. Worthington*, 38 Md. 298 (1873), where Judge Alvey said for the Court:

"[I]n all cases for specific performance [of a contract to devise real estate] the contract must be accurately stated in the bill, and the proof must in every essential particular correspond with the terms of the contract thus set up. The proof must be clear and explicit, leaving no room for reasonable doubt. And in cases for the specific enforcement of a contract to devise, like the present, where the property has been devised to other parties, the utmost certainty is required, as, by the enforcement of the contract, the court undertakes to set aside a solemn testamentary act of the deceased party, in the absence of all possible explanation of his conduct, and when he is no longer present to vindicate himself against the imputation of bad faith. To such cases may well and most aptly be applied the rule so clearly and forcibly stated by the late Mr. Justice Grier, of the Supreme Court, in delivering the opinion of that tribunal, in a case of an application for specific performance. In speaking of the character and certainty of proof required on such applications, he said: 'Such proof must be clear, definite and conclusive, and must show a contract leaving no *jus deliberandi* or *locus penitentiae*. It cannot be made out by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversations, which the

witness had no reason to recollect from interest in the subject-matter, which may have been imperfectly heard or inaccurately remembered, perverted or altogether fabricated; testimony, therefore, impossible to be contradicted.' *Purcell v. [Coleman]*, [71 U. S. 513, 517, (] 4 Wall. [513,] 517 [ ), 18 L. Ed. 435 (1867 )]." *Id.* at 318-19.

The daughters suggest:

"[I]t is clear that while the mere execution of a joint will by husband and wife does not by itself prove the existence of an underlying agreement, it does give rise to at least an inference of mutuality. Additionally, it is equally certain that reciprocal terms and a dispositive scheme under which husband and wife testators limit themselves to only a life estate interest in all property, should he or she be the survivor, with benefit over to a named third person in whom both share a common interest, all combine to provide the additional evidence necessary to establish the underlying agreement, as a matter of law."

One of the leading cases supporting this point of view is *Nye v. Bradford*, 144 Tex. 618, 193 S.W.2d 165 (1946). Other cases include: *Van Houten v. Whitaker*, 169 Cal. App. 2d 510, 337 P. 2d 900 (2d Dist. Div. 1, 1959); *Weiss v. Storm*, 126 So. 2d 295 (Dist. Ct. App. Fla. 1st D. 1961); *Frazier v. Patterson*, 243 Ill. 80, 90 N. E. 216 (1909); *In re Estate of Marcucci*, 5 Ill. App. 3d 484, 285 N.E.2d 141 (1st D. 1971), *rev'd on procedural grounds* 54 Ill. 2d 266, 296 N.E.2d 849 (1973); *Helms v. Darmstatter*, 56 Ill. App. 2d 176, 205 N.E.2d 478 (5th D. 1965), *aff'd* 34 Ill. 2d 295, 215 N.E.2d 245 (1966); *In re Weidman's Estate*, 181 Kan. 718, 314 P. 2d 327 (1957); *In re Estate of Adkins*, 161 Kan. 239, 167 P. 2d 618 (1946); *Tutunjian v. Vetzigian*, 299 N. Y. 315, 87 N.E.2d 275 (1949); *Rastetter v. Hoenninger*, 214 N. Y. 66, 108 N. E. 210 (1915); *Seat v. Seat*, 172 Tenn. 618, 113 S.W.2d 751 (1938); *Wilson v. Starbuck*, 116 W. Va. 554, 182 S. E. 539 (1935); and *Schwartz v. Schwartz*, 273 Wis. 404, 78 N.W.2d 912 (1956).

A number of writers have criticized or taken positions inconsistent with the reasoning of these cases. Their point of view is perhaps best articulated by Professor Bertel Sparks, *Contracts to Make Wills* 26 (1956), where he takes the general position that "[t]he rule requiring that contracts to devise or bequeath be proved by clear and convincing evidence should be strictly adhered to and all attempted encroachments upon it carefully guarded against." With reference to joint wills in particular he said:

"The courts do not always display the desired amount of diligence in the application of the 'clear and convincing' rule and this tendency becomes especially pronounced when they are confronted with the wills of two or more persons which, when considered together, show on their face, by their reciprocal provisions or otherwise, that they were intended as part of one integrated scheme or plan. Such wills might consist of one document executed by two or more persons as the will of each of them, in which case they will be referred to as joint wills; or they might consist of separate documents which nevertheless reveal the common scheme or plan, in which case they will be referred to as mutual wills. Where wills of this kind are concerned the courts still give verbal adherence to the rule that clear and convincing evidence is required to prove the existence of a contract, but an examination of the results reached raises a very real question as to the exactitude with which the rule is applied. When two people execute a common document as the will of each of them or when they execute separate documents at approximately the same time and in identical or almost identical language there is a tendency to pass too easily to the conclusion that such action must have been the result of a contract.

"The clear weight of authority, and certainly the sounder view, is that the mere presence of either joint or mutual wills does not raise any presumption that they were executed in pursuance

of a contract. Nor is this rule altered by evidence that the parties had 'agreed' to the making of such wills. Of course they had so agreed. The mere presence of such wills reveals that the parties must have talked the matter over and must have arrived at an understanding or agreement concerning their testamentary dispositions. Such discussions and such understandings between persons of close affinities, especially between husbands and wives, are not unusual and the fact that they have taken place is no indication that there has been any thought of a binding contract." *Id.* at 26-28.

He argues that "[t]he use of such pronouns as 'we,' 'our,' and 'us' in joint wills is often said to be indicative of a contract" but "[s]uch language should be taken as nothing more than the normal and natural usage of two people attempting to execute two wills as one document," that this language "indicates that they have talked over their testamentary plans and have agreed upon a certain scheme of disposition, but is completely silent as to whether or not a contract has been entered into. Such has been the position of the better reasoned opinions." Relative to two wills executed simultaneously he says:

"Closely related to the problem of joint wills is the situation presented by two wills executed by different testators as separate documents but indicating on their face or through the surrounding circumstances that the two were parts of a single transaction or at least had been discussed or considered together. Sometimes the language is identical except for such differences as are necessitated by two different testators being involved. There is sometimes evidence that the two testators consulted the draftsman together and quite often both wills are attested by the same group of attesters. The provisions of such wills are usually reciprocal in that each testator gives the other a life estate, with or without a power to consume, with a gift over to a common

remainderman. Do any or all of these factors prove the existence of a contract for the making of these mutual wills? The general rule is that they do not." *Id.* at 29.

He points out relative to mutual wills that "[t]he fact that each testator had knowledge of the other will is sometimes emphasized as evidence of a contractual relationship. It is quite apparent that all these cases which are contrary to the general rule stated above result from a confusion of evidence of an understanding or a common plan with evidence of a contract. This confusion has resulted in the finding of some contracts on extremely slender evidence and in the occasional suggestion that the presence of reciprocal provisions is sufficient without more to prove the contractual relationship."

A view similar to that put forward by Professor Sparks is found in T. Atkinson, *Handbook of the Law of Wills* § 49 (2d ed. 1953):

"Many questions arise concerning the proof of contracts to leave one's property in accordance with the terms of joint or mutual wills. It is important to distinguish between a mere agreement to make a will and one not to revoke the same. Sometimes, though not often, there is a separate written contract to the latter effect. The wills themselves may recite the agreement which is made. It is generally held that the mere making of mutual separate wills is not sufficient evidence of a contract not to revoke. While their form and content often indicate that each testator knew about the other's will and it may even be inferred that there was concert in making them, we should not infer a contract not to revoke without further proof. In the case of a joint will however, some courts have indicated that the will by itself permits the inference of an agreement not to revoke. Possibly the execution of a joint will has more of a tendency to indicate a contract not to revoke than

in the case of mutual separate wills. But the better view is that the proof of the execution of a joint will without further evidence is not sufficient proof of a contract not to revoke." *Id.* at 226.

Similar reasoning is found in 1 J. Alexander, *Commentaries on the Law of Wills* §§ 97, 98 (1917), and *Bowe—Parker: Page on Wills* § 11.1 (1960). The latter states:

"The fact that joint wills and mutual wills are usually executed as the result of a common intention does not in any way mean that they are always executed pursuant to a contract between the parties respecting the making of such wills. Though it is true that in many cases the joint will or the mutual wills are made as the result of a contract to make reciprocal wills, there are undoubtedly an equal number of cases in which the common intention does not proceed anywhere near to the point where arms length promises are exchanged, consideration exists, and a contract emerges. It is more logical to expect that in many settings, particularly that of husband and wife, the reciprocity or similarity in the dispositive provisions of the two wills results from similar tastes and affections that have resulted from years of living together, and the making of identical or similar wills was a spontaneous thing unaccompanied by even so much as a thought on the part of either husband or wife that they should enter into a contract with each other. The sole fact, standing alone, that two wills were executed at or near the same time and bear similar provisions should in no way give rise to a presumption or an inference that they were made pursuant to a contract." *Id.* at 554.

*See also* P. Sykes, *Maryland Probate Law and Practice* § 12 (1956), and T. Jarman, *Wills* (8th ed. 1951), which latter work states:

"The fact that a husband and wife have

simultaneously made mutual wills, giving each to the other a life interest with similar provisions in remainder, is not in itself evidence of an agreement not to revoke the wills; in the absence of a definite agreement to that effect there is no implied trust precluding the wife from making a fresh will inconsistent with her former will, even though her husband has died and she has taken the benefits conferred by his will." *Id.* at 42.

Some courts have refused upon the ground of lack of consideration to find an underlying agreement which makes the provisions of a joint will enforcible in equity. *See, e.g., Clements v. Jones,* 166 Ga. 738, 746, 144 S. E. 319 (1928); *In re Estate of Johnson,* 233 Iowa 782, 791, 10 N.W.2d 664 (1943); *Menke v. Duwe et al.,* 117 Kan. 207, 220, 230 P. 1065 (1924); *In re Gudewicz' Will,* 72 N.Y.S.2d 838, 839 (Surrogate's Ct., Richmond Co. 1947); and *Lee v. Powell,* 285 S.W.2d 291, 296 (Tex. Civ. App., Waco 1956). Other cases have simply emphasized the lack of evidence where what was relied upon to establish a contract was merely reciprocal provisions or a general scheme in conjunction with the relationship between the parties. *See, e.g., Lamberg v. Callahan,* 455 F. 2d 1213 (2d Cir. 1972); *Rolls v. Allen,* 204 Cal. 604, 269 P. 450 (1928); *Father Flanagan's Boys' Home v. Turpin,* 252 Iowa 603, 612, 106 N.W.2d 637 (1960); *In re Estate of Pennington,* 158 Kan. 495, 500, 148 P. 2d 516 (1944); *Neff v. Poboisk,* 281 Minn. 475, 161 N.W.2d 823, 825-26 (1968); *Glidewell v. Glidewell,* 360 Mo. 713, 722, 230 S.W.2d 752 (1950); *Edson v. Parsons,* 155 N. Y. 555, 50 N. E. 265 (1898); *In re Gudewicz' Will, supra; Ginn v. Edmundson,* 173 N. C. 85, 91 S. E. 696 (1917); *Rhodes's Estate,* 277 Pa. 450, 453-54, 121 A. 327 (1923); *Havird v. Schissell,* 251 S. C. 416, 162 S.E.2d 877, 878 (1968); and *Beveridge v. Bailey,* 53 S. D. 98, 106-07, 220 N. W. 462 (1928).

The claim of the daughters that their mother received benefits under the will of their father that should preclude her from making a will contrary to the 1942 will is rebutted insofar as the personal estate is concerned by the administration account showing a deficit in the father's

estate. There is absolutely no evidence in the record establishing that any real estate passed to Mrs. Pumphrey under the will of her husband. Argument that because of the agreement between the parents the mother received property held as tenants by the entireties is a fallacious one since in order to receive title to land thus owned by the parties all she had to do was to survive her husband. Obviously, the will could have no effect upon the title to property thus held.

From the evidence we know only that Mr. and Mrs. Pumphrey were irked at the marriage of their daughter, that they executed a will together penalizing that daughter, that Mr. Pumphrey announced his intention of making such a will, that Mr. Pumphrey said they had made such a will, that a neighbor was told by both Mr. and Mrs. Pumphrey that they had made such a will, that the will was handed to the two remaining children to read, that Mr. Pumphrey predeceased his wife, that Mr. Pumphrey's personal estate was not sufficient to pay the sums due, that Mrs. Pumphrey wrote a later will, and that when Mr. and Mrs. Pumphrey operated their hog farm Mrs. Pumphrey normally received one-third of the proceeds of sales of hogs.

We believe the sounder view to be that expressed by Professor Sparks, a view in line with that expressed by the Court of Appeals in *Semmes v. Worthington, supra,* a somewhat analogous case, "that the mere presence of either joint or mutual wills does not raise any presumption that they were executed in pursuance of a contract. Nor is this rule altered by evidence that the parties had 'agreed' to the making of such wills." The evidence adduced here is a far cry from establishing a contract between Mr. and Mrs. Pumphrey as to the disposition of their estate which could be the basis for specific performance. As Judge Alvey pointed out for the Court in *Semmes v. Worthington, supra,* what the daughters would here have us do is "to set aside a solemn testamentary act of the deceased party [(their mother)] ... when [she] is no longer present to vindicate h[er]self against the imputation of bad faith"; accordingly, the proof should correspond with the terms of the contract

which the daughters seek to establish. There is no showing in this case of "a dispositive scheme under which husband and wife testators limit themselves to only a life estate interest in all property, should he or she be the survivor, with benefit over to a named third person in whom both share a common interest" as contended by the daughters. The burden of proof was upon the daughters as the plaintiffs. They left the chancellor unpersuaded. Generations of Maryland lawyers have sought jury instructions to the effect that if testimony in a case should leave the mind of the jury in a state of equipoise or even balance, then their verdict should be for the defendant. *See, e.g., Morris v. Christopher,* 255 Md. 372, 380, 258 A. 2d 172 (1969); *Sullivan v. Smith,* 123 Md. 546, 558, 91 A. 456 (1914); *Barabasz v. Kabat,* 86 Md. 23, 37, 37 A. 720 (1897); *Ohlendorf v. Kanne,* 66 Md. 495, 498, 500, 8 A. 351 (1887); and A. Thomas, *Prayers and Instructions* § 311 (1908). The rule, obviously, must be the same if the trier of fact is a judge rather than a jury.

On the facts presented in this case we cannot say that the chancellor was clearly in error when the proof adduced by the plaintiffs left him unpersuaded as to the essentials of the contract.

*Judgment affirmed; appellants to pay the costs.*