DONALD E. CAMPBELL *v.* TIMOTHY E.
WELSH, Personal Representative
of the Estate of Mildred C.
Campbell ET AL.

[No. 1271, September Term, 1982.]

*Decided May 9, 1983.*

The cause was argued before WILNER, GARRITY and ADKINS, JJ.

*Thomas B. McCarty* for appellant.

*Arnold G. Ziegler* for appellees William C. Campbell and Frances Kimberl, with whom were *Richard Strom* on the brief for appellee Timothy E. Welsh and *James F. Maher* on the brief for appellee Robert Campbell.

WILNER, J., delivered the opinion of the Court.

Mildred Campbell died on July 5, 1980, without a will. Surviving her as her heirs were four of her five children and several children of the one child who had predeceased her. At the time of her death, Mrs. Campbell was the record owner of a 2-1/2 acre tract of land in Howard County known as 9575 Gorman Road.

On November 14, 1980, appellant, one of Mrs. Campbell's surviving children, filed an equity action in the Circuit Court for Howard County, in which he alleged that "in the year of about 1965," he and his mother had entered into a "verbal agreement" under which she agreed to sell him a part of her property, as shown in a survey plat attached to the bill of complaint.[1] The agreement, he averred, called for him to pay a purchase price of $2,500 — $1,500 down and the $1,000 balance "from time to time as [his] financial condition . . . permitted" — and to do certain renovation work on and about the property. He claimed that he made the down

---

1. The survey, commissioned about the time the action was filed, divided the tract into two parcels — one being approximately 1.43 acres, the other being just under 1.05 acres. Appellant claimed the larger parcel.

payment, did the renovation work, otherwise improved the property, and had been in exclusive possession of "the subdivided parcel" since the making of the agreement.

"In about the year of 1970," he continued, his mother, out of gratification, love, and affection, excused him from making any further payments and "promised him that she would make her Will in which she would confirm the sale of the subdivided parcel to [appellant] on the said terms and excuse him from payment of the balance of the purchase price thereof." Finally, he alleged that Mrs. Campbell did in fact leave such a Will, "but he has been unable to locate the same."

The bill of complaint named as respondents Mrs. Campbell's remaining heirs (the other children and grandchildren) and the personal representative of her estate. The relief sought was "[t]he appointment of a trustee to convey the subdivided parcel to [appellant] free and clear of any further liability to pay the balance of said purchase price" and "such other and general relief as to the Court may appear meet and proper in the premises."

On June 1, 1981, after the respondents had answered the bill of complaint, appellant filed "amendments by interlineation" through which he added an alternative claim for damages. In a new paragraph 15, he averred that:

> "In the event [he] does not acquire ownership of said subdivided parcel in this proceeding, then he should be awarded damages against the Defendants in an amount equal to the fair and reasonable value of the improvements made by him in and to both said parcels to avoid the unjust enrichment on the part of the heirs of the estate. . . ."

To secure that right, he asked for a lien on the two parcels "and appointment of a trustee to conduct a sale thereof to satisfy such lien."

Six weeks later — on July 20, 1981 — appellant filed an amended bill of complaint in which, for the first time, he quantified his claim for the improvements made by him,

alleging their value to be $60,297, and added a further claim seeking reimbursement for certain utility bills paid by him. He did not specify the amount of these bills.

Ultimately, after some additional exchanges of pleadings, the case proceeded upon appellant's second amended bill of complaint, in which he continued to seek (1) specific performance of his oral agreement — that the personal representative or a trustee be directed to convey the parcel to him, and (2) in the alternative, a money judgment for the value of the improvements made by him (which was revised to $56,700) plus the utility payments (to which no value was yet assigned).

The case was resolved in two stages. On June 2, 1982, the court entered summary judgment against appellant on his claim for monetary damages and, on July 28, 1982, after trial, the court denied appellant's request for specific performance. This appeal challenges both of those rulings.[2]

## (1) *Specific Performance*

Appellant's principal claim, for specific performance, was rejected by reasor of the Statute of Frauds. Md. Code Ann. Real Property art., § 5-104 provides:

"No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him."

---

2. The June 2 order was in the form of an actual judgment on the claim for money damages. The July 28 order said only that the "prayer for specific performance be and hereby is DENIED." It would, of course, have been better, and clearer, if the court had simply dismissed the bill or entered a judgment for costs. The fact is, however, that the denial of appellant's prayer for specific performance fully and finally disposed of the only open issue in the case, and thus effectively precluded appellant from further prosecuting his action in the circuit court. In conjunction with the June 2 order, therefore, we shall regard the July 28 order as a final, appealable judgment. *See United States Fire Ins. v. Schwartz*, 280 Md. 518 (1977).

Appellant acknowledges that the contract upon which he sues was a verbal one. It was never reduced to writing and there is no evidence of any written memorandum or note of it signed by Mrs. Campbell. Undaunted by this seemingly fatal lapse, appellant argues that (1) he is entitled to have a constructive trust declared upon the land, and (2) by reason of his partial performance of the contract, the bar of the statute does not apply.

Appellant's theory of constructive trust appears to be based upon a passage from *Berens v. Wortman,* 250 Md. 343 (1968). At page 348, the Court stated that

> "agreements to purchase land can be enforced in spite of the absence of a writing or memorandum sufficient to satisfy the Statute of Frauds where the circumstances require that equity impose a constructive trust, and these circumstances can exist when the parties stand in a confidential relationship."

We have no quarrel with that principle, as so stated. It clearly is the law in Maryland. The problem, for appellant, is that the record before us fails to demonstrate any circumstance calling for the imposition of such a trust. His assertion that he "was accustomed to be guided by his Mother's . . . judgment and had the fullest confidence that she would act in his interest only," which forms the sole basis of his claim, falls woefully short of what is needed to cast aside the Statute of Frauds and impress upon the land a constructive trust. *Compare O'Connor v. Estevez,* 182 Md. 541 (1943) and *Dove v. White,* 211 Md. 228 (1956), where such trusts *were* imposed.

With respect to appellant's defense of part performance, the evidence showed that, at some point in 1965, appellant and his family moved onto the disputed part of his mother's property. At that time, according to him, his mother agreed to sell him that part for $2,500, of which $1,500 was to be paid then and the balance when and as he could afford it. There is no written evidence of the contract or the $1,500

payment; nor, aside from appellant, were there any witnesses to either event. No check, no receipt, no bank records — nothing, aside from some hearsay testimony from appellant's wife and daughter was offered to show the actual transfer of the $1,500.

After moving onto the property, appellant built a storage shed and a "shop," which he used in his construction business. He renovated an old dwelling house situated on that part of the property purportedly retained by the mother, which he used as a residence for himself and his family; he planted an "orchard" of some twenty-five trees, whose bounty he retained for himself; he built a driveway from Gorman Road to his new residence; and he did some repair or maintenance work in or about the house trailer in which his mother lived. Appellant remained on the property — both parts of it — without making any further payments to his mother, for the next fifteen to sixteen years.

Because of the strictures of the "Dead Man's Statute" — Md. Code Ann. Courts art., § 9-116 — appellant was precluded from testifying about the alleged transaction, and so he offered to prove the contract itself through his wife and children.

Appellant's wife testified that "around '66, somewhere along in there" — when they first moved onto the property — her mother-in-law told her "that she'd sold Don [appellant] a piece of land" and that "he'd gave her fifteen hundred dollars on the piece of property." The wife was not certain if anyone else was present when this conversation occurred. In 1970, during a family gathering, there was another conversation with the mother. The wife's testimony was as follows:

> "A. Well, she was telling Don that — well, she was telling me and my daughter, Don-Ann, she was talking about how nice the dwelling house looked where we was living, and she said then, at that time, that she was going to relieve him of the money that he still owed on the property, because it — I think the original thing, I think, was

twenty-five hundred dollars. I'm not, you know, real certain that's what she said.

Q. Did she mention any amounts?

A. I think she said twenty-five hundred, she had gotten fifteen. As best as I can recall that's what it was."

In that same conversation, according to the wife, the mother said that *"she was going to make a will, and she told Don, she said if, you know, if anything happened to him that she would leave the property to the oldest daughter* [of appellant]." (Emphasis supplied.)

The daughter, Don-Ann, also testified about this 1970 conversation. She recalled her grandmother saying,

"That the thousand dollars that he owed he would not owe anymore, and that she would go ahead and put the property, the deed, in his name, and my father replied no, because of some problems I'm having with taxes, or something, I don't want the deed in my name, but in the event of my death I would want you to put the property in my daughter's name — *Don-Ann's name,* and she said she would do that and would confirm so *in her will."* (Emphasis supplied.)

The only other evidence purporting to corroborate the alleged contract (aside from evidence as to the improvements made by appellant) came from appellant's other two daughters — Myra and Rebecca. Both recalled instances when they or appellant did work on the grandmother's "part" of the property and when the grandmother referred to the part where they lived as their father's land. Rebecca purported to recall a conversation occurring in 1966 — when she was ten years old — regarding the boundary line between the two parcels.

The general principles of law regarding cases such as this were laid down in *Semmes v. Worthington,* 38 Md. 298 (1873). There, as was ultimately the case here, the com-

plainant was seeking specific performance of an oral agreement to convey land by will; there, as here, he defended against the Statute of Frauds on the ground of part performance measured principally by his possession of the land, his working it, and his making certain payments in furtherance of the agreement.

Speaking for the Court, Judge Alvey addressed both the nature of the acts sufficient to constitute the requisite part performance and the type and degree of evidence necessary to prove those acts. As to the first, the Court held, at pp. 326-27:

> "The act relied on as part performance must, in itself furnish evidence of the identity of the contract; and it is not enough that it is evidence of some agreement, but it *must relate to and be unequivocal evidence of the particular agreement charged in the bill. Canal Co. v. Young,* 3 Md. 480. And the court is never anxious to grasp at slight circumstances to rescue a case from the operation of the Statute, nor does it indulge in any latitude of construction, where there is any equivocation or uncertainty in the case presented. It adopts the rule that the contract should be clear and definite, and that the acts done should be equally clear and definite and solely with a view to the performance of the particular agreement.... The acts done must be of a substantial nature, and such, that the party would suffer an injury amounting to a *fraud* by the refusal to execute the agreement." (Emphasis in original.)

These principles have been repeated and applied many times by the Court of Appeals. *See, for example, Shimp v. Shimp,* 287 Md. 372, 382-83 (1980); *Beall v. Beall,* 291 Md. 224, 230 (1981); *Withers v. Douglas,* 206 Md. 141 (1955); *Shives v. Borgman,* 194 Md. 29, 35 (1949). In *Hamilton v. Thirston,* 93 Md. 213, 219 (1901), the Court adopted Lord Hardwicke's pronouncement in *Lacon v. Mertins,* 3 Atk. 4,

that the act relied on as part performance "Must be such an act done as appears to the Court would not have been done unless on account of the agreement," adding that the Court of Appeals itself "has repeatedly said that such acts must be clear and definite *and refer exclusively to the alleged agreement.*" (Emphasis supplied.) That too has been repeated and followed by the Court in later years. *See Soho v. Wimbrough,* 145 Md. 498 (1924); *Serio v. Von Nordeck,* 189 Md. 388 (1947).

As to the nature and quantum of proof necessary to establish these unequivocal acts, the Court in *Semmes v. Worthington, supra,* at 318, held that "[t]he proof must be clear and explicit, leaving no room for reasonable doubt." Quoting then from Justice Grier's Opinion in *Purcell v. Miner,* 4 Wall. 517, Judge Alvey continued:

> " 'Such proof must be clear, definite and conclusive, and must show a contract leaving no *jus deliberandi* or *locus penitentiae. It cannot be made out by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversations, which the witness had no reason to recollect from interest in the subject-matter, which may have been imperfectly heard or inaccurately remembered, perverted or altogether fabricated; testimony therefore, impossible to be contradicted.'* " (Emphasis supplied.)

That remains the standard to this day. *See Moats v. Estate of Lily W. Pumphrey,* 33 Md.App. 9, 18 (1976).

Against this high standard of proof, the evidence supplied by appellant is grossly insufficient. The contract itself is unclear — first an agreement to sell *him* a parcel of land for $2,500, four or five years later an agreement to modify the purchase price by forgiving the unpaid balance of $1,000, and finally a new agreement to leave the property to appellant's daughter who, we note, is not even a party to this proceeding.[3] Even this much we glean only, in the words

---

3. Don-Ann's status as the ultimate beneficiary was not clearly alleged

penned by Justice Grier and quoted by Judge Alvey, "by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversations. . . ."

The acts offered up as part performance of this rather fluid agreement are hardly referrable exclusively to it. Appellant, who was in the construction business, took possession of a piece of land, built some improvements on it that he used in his business, and renovated an existing house for use as his home. He built a driveway from the house to the road, planted some trees, and maintained the yard. He lived and worked there for fifteen or sixteen years, paying nothing more than the $1,500 he claims to have paid in 1965. If that were enough to avoid the Statute of Frauds, there would be no Statute of Frauds.

### (2) *Money Damages*

Our conclusion that the alleged agreement between appellant and his mother is unenforceable by reason of the Statute of Frauds does not necessarily dispose of his claim for money damages. For, as the Court of Appeals held in *McNamee v. Withers,* 37 Md. 171, 177-78 (1872),

> "The principle is well established, that if one person expends his money in making beneficial improvements on the land of another, upon the faith of a parol contract by the latter to convey; where specific execution of the contract cannot be decreed, because of the uncertainty in the proof of its terms, a court of equity will decree compensation to the extent of the value of such improvements, and in some cases, as in *King v. Thompson,* 9 Pet. 204, will grant relief by declaring the same to be an equitable lien upon the property."

---

until near the end of trial, at which point appellant amended his complaint to conform with the evidence. Appellees made no objection either to the evidence regarding Don-Ann or to the amendment. Nor have they raised her non-party status as a defense in this appeal, believing, as they indicated at oral argument, that appellant remains the real party in interest.

*See also Stevens v. Bennett,* 234 Md. 348, 352 (1964); *Mangione v. Braverman,* 234 Md. 357 (1964); *Boehm v. Boehm,* 182 Md. 254 (1943); *Duck v. Quality Custom Homes,* 242 Md. 609 (1966), permitting recovery at law, on a *quantum meruit* basis, for services performed or money paid in reliance on an unenforceable oral contract for the sale or devise of realty.

The circuit court apparently recognized this principle, as it did not dispose of appellant's alternative claim for money damages on the basis of the Statute of Frauds. That claim was rejected because it was filed too late, which, indeed, it was.

Md. Code Ann. Est. & Tr. art., § 8-103 (a) provides, with exceptions not relevant here, that,

> "all claims against an estate of a decedent, whether due or to become due, absolute or contingent, liqui-dated or unliquidated, founded on contract, tort, or other legal basis, are forever barred against the estate, the personal representative, and the heirs and legatees, unless presented within six months after the first appointment of a personal rep-resentative."

The first appointment of Mrs. Campbell's personal rep-resentative, who, ironically was appellant, occurred on July 15, 1980,[4] and notice of that appointment was duly given to creditors. Appellant had six months from that date — until January 15, 1981 — to file his claim.

No claim of any kind based upon the alleged oral agreement between appellant and his mother or otherwise respecting the land in question was made until appellant filed his first bill of complaint in November, 1980. That, of course, was filed within the six-month period; but, as noted, no claim was made therein for any money damages. The only

---

4. Appellant resigned as personal representative on August 29, 1980, apparently in contemplation of filing this action. On September 16, 1980, appellee Welsh was appointed as his successor.

specific relief sought by that bill was a conveyance of the "subdivided parcel" free from the obligation to pay the remaining part of the purchase price. The first articulated (though unquantified) claim for monetary relief came on June 1, 1981, which was more than five months beyond the statutory deadline.

Appellant seeks to escape the bar of the statute by suggesting first that it does not apply to actions in equity to determine the ownership of real estate and, second, that as he timely filed such an action in which there was a prayer for general relief, equity jurisdiction would continue over his subsequent claim for damages, added by amendment, which should be regarded in any event as subsumed in his initial chatchall prayer for general relief. It is an interesting argument, but not a persuasive one.

Section 8-103 was first enacted in 1969, as part of a general revision of the State testamentary law. That revision made a number of substantial changes in both the law and the practice governing the administration of decedents' estates, and § 8-103 has to be read in the light of those changes, three of which are of particular significance.

(1) Prior to 1969, real and personal property were treated differently by the testamentary law. Only personal property passed through the probate estate; a decedent's interests in real property devolved directly to his heirs or devisees. *See Goldman v. Walker,* 260 Md. 222 (1970); *Heill v. Staniewski,* 265 Md. 722 (1972). Except in very limited circumstances, neither the administrator of an intestate estate nor the executor under a will had any interest in a decedent's real property. *Heill, supra,* 265 Md. at 724. He acquired no title to it and no right to possess it.

One of the exceptions to this was noted in § 86 of former art. 93, which authorized an executor/administrator to convey land that the decedent had contracted to sell, and to execute confirmatory deeds — *i.e.,* to complete a sale which the decedent had made — provided he could satisfy the orphans' court "that the purchaser had paid the full amount of the purchase money." If there was any dispute about the

sale, however, or about the payment of the purchase price, it could not be resolved by the orphans' court. The claimant had to proceed in the law or equity court. *See Stewart v. Griffith,* 217 U.S. 323 (1910); *Grant Coal Co. v. Clary,* 59 Md. 441 (1883).

With this, and a very few other exceptions, claims regarding a decedent's interest in real property were not made to the executor/administrator or to the orphans' court because there was little or nothing that either could do about them.

(2) The old law did not, directly, specify any particular period for presenting claims. That matter was dealt with indirectly through the interaction of §§ 121 and 123 of former art. 93. Section 121 provided, in general, that an executor/administrator was not liable, and could not successfully be sued, upon any claim of which he had no prior notice, filed after the estate assets had been distributed. Section 123 provided for the publication of a notice to creditors, advising them of the opening of the estate and warning them to present their claims by a day certain. Although such publication was not mandatory (as it is now), the statute provided that, if such notice was published at least six months prior to distribution of the estate assets, the executor/administrator would be absolved from liability on any claim of which he had no notice. If he failed to publish the notice as prescribed by § 123, he was not entitled to the protection of § 121, and would remain personally liable on subsequent claims, even after all the estate assets were distributed. *See Steuart v. Carr,* 6 Gill 430 (1848).

There *was* a special statute of limitations under the old law, but it was not directed at the initial presentment of claims. Claims filed with an executor/administrator could not be paid until "passed" by the orphans' court (§ 90). But, even if that court "passed" the claim, the executor/administrator had the absolute right to reject it, in which event it was incumbent upon the creditor to file an action at law or in equity, as the case may be, within six months after such rejection. *See* §§ 107, 119, and 120; *also*

*Schaefer v. Heaphy,* 45 Md.App. 144 (1980). That was the creditor's only recourse if he wished to be paid from estate funds; and, if he failed to file his action timely — within the six-month period following rejection — his claim, according to § 120, was "forever barred."

(3) Section 120, and its special counterpart requiring actions for personal injury to be filed within six months after qualification of the executor/administrator (§ 112), were strictly construed. They were regarded not as ordinary statutes of limitations, but as absolute statutory bars, prohibiting an untimely suit against the executor/administrator. *See Bogart v. Willis,* 158 Md. 393 (1930); *Frank v. Wareheim,* 177 Md. 43 (1939); and *Chandlee v. Shockley,* 219 Md. 493 (1959). Failure to comply with the requirement of those statutes effectively precluded any recovery from estate assets, since, absent a judgment of the law or equity court, the executor/administrator simply refused to pay the claim, as, under § 107, he had an absolute right to do.

There was a major "loophole," however. Although § 120 barred an untimely suit against the executor/administrator, it did not prevent a creditor from pursuing his otherwise stale claim against the decedent's heirs and legatees. *See Zollickoffer v. Seth,* 44 Md. 359 (1876), where, at pp. 370-71, the Court observed that the statute exonerated only the executor or administrator, not the estate, and that,

> "It is nowhere declared or intimated that there should be no remedy for a creditor who may have failed to authenticate and notify his claim to the executor, before final administration; or that, if the creditor's claim be not ascertained or provable before such final settlement and distribution, he should be without remedy, notwithstanding his debtor's assets may be shown to be abundant, simply because the executor or administrator may have delivered them over to legatees or distributees."

Relying on English practice and authority, the Court adopted the principle that a creditor who was barred under the statute from pursuing his claim against the personal representative could, subject to the defense of laches, pursue it against the heirs and legatees into whose hands the decedent's property had devolved. The theory, as expressed by Justice Story (2 Eq. Juris., § 1251, quoted at p. 374 of 44 Md.) was that "[t]he legatees and distributees are in equity treated as trustees for this purpose; for they are not entitled to anything, except the surplus of the assets after all the debts are paid." *See also Brian v. Thomas,* 63 Md. 476 (1885); *Constable v. Camp,* 87 Md. 173 (1898); but *compare VanBibber v. Reese,* 71 Md. 608 (1889).

Under this old practice, appellant's claim for money damages may well have been cognizable against the decedent's heirs, if not against her personal representative, whether or not he complied with the limitations period set forth in §§ 119 and 120.

All of that practice changed, however, with the 1969 rewriting of our testamentary laws. For one thing, a decedent's interests in real property are no longer exempt from probate; they now form part of the overall estate and pass to the personal representative along with the decedent's personalty. The personal representative administers the entire real and personal estate. *See* Md. Code Ann. Est. & Tr. art., § 1-301. In addition, the rule promulgated in *Zollickoffer v. Seth, supra,* allowing a creditor to pursue his claim directly against the heirs and distributees has been expressly repealed. Section 8-103(a) makes clear that, if the claim is not presented in timely fashion, it is barred "against the estate, the personal representative, and the heirs and legatees." As explained in the Official Comment of the Governor's Commission to Review and Revise the Testamentary Law of Maryland, which drafted the 1969 statute (including § 8-103):

> "The Commission concluded that if a creditor has not filed his claim within the statutory period (six months) after notice to creditors, he should be

> barred from proceeding against not only the estate, but also the legatees or their heirs. This represents a fundamental change in the Maryland law. Under the case of Zollickoffer v. Seth, 44 Md. 359 (1876), a creditor may proceed against the heirs or legatees even if he has not filed a claim against the estate. In many instances, the assertion of a claim against the heirs or legatees, after the final distribution of the estate, has resulted in considerable, and quite unexpected, hardship. The Commission felt that at some point after a decedent has died the heirs and legatees ought to be able to receive the property with the assurance that no further claims could be made against them. The continuation of the present six month date is reasonable in that it gives creditors sufficient time to file their claims and at the same time tends to encourage the prompt administration and settlement of estates."

Most important, however, in terms of this case, the new law created what in effect is a two-tiered set of limitations periods. Whereas the old law, as noted, focused primarily on the time for filing an action after rejection of the claim by the executor/administrator, the new law imposes a specific time requirement both on the initial presentment of the claim to the personal representative and on seeking judicial review of his rejection of it. Section 8-103 (a) sets forth the first requirement; section 8-107 (b) prescribes the second.

Section 8-107 (b) is the carry-over of former § 120. It provides that, if a claim is disallowed by the personal representative,

> "the claimant is forever barred to the extent of the disallowance unless he files a petition for allowance in the [orphans'] court or commences an action against the personal representative or against one or more of the persons to whom the property has been distributed. The action shall be commenced

within 60 days after the mailing of notice [of disallowance] by the personal representative." [5]

Section 8-103 (a) is the new provision, although it borrows the approach, and some of the language, of former §§ 112 and 120. In the plainest language, it applies to "all claims against an estate" and provides that, unless such claims are presented within the six-month period allowed, they are "forever barred." [6]

The presentment of claims is governed by § 8-104, which provides three methods of making such presentment: (1) by delivering to the personal representative "a verified written statement of the claim, indicating its basis, the name and address of the claimant, and the amount claimed" — subsection (b); (2) by filing a "verified statement of the claim" with the register of wills (and mailing a copy to the personal representative) in a form which specifies the amount claimed — subsection (c); or (3) where the cause survives death, by commencing an action against the estate or against a person to whom property has been distributed "within the time limited for the filing of claims" — subsection (d). That time, of course, is six months. *See Collier v. Connolley,* 285 Md. 123 (1979).

Unlike subsections (b) and (c), which, directly or indirectly, prescribe a certain form for claims filed with the personal representative or the register of wills, subsection

---

5. *See* the Commission's Comment to § 8-107, pointing out that

"[t]his provision [subsection (b)] is also similar to former § 120. The Commission has changed the Maryland rule which requires an action to be commenced by a creditor within six months after the personal representative has mailed his notice of disallowance, to a sixty-day period, in order to encourage the more prompt administration and settlement of estates."

6. *See,* however, § 8-103 (e) providing that "[n]othing in this section shall affect or prevent an action or proceeding to enforce a mortgage, pledge, judgment or other lien, or security interest upon property of the estate." But note the Commission's Comment construing subsection (e) as

"mak[ing] it clear that the failure of the secured creditor to file his claim does not impair his right *against the security;* it only impairs his rights to a personal judgment against the personal representative, the heirs, or the legatees. The failure to file a claim has, therefore, the same effect as an exculpatory clause in the security agreement." (Emphasis supplied.)

(d) does not purport to direct what must be included in a judicial pleading. That is governed by the Maryland Rules, however, in particular rules 301, 340, and 370. In effect, these rules require much the same information as subsections (b) and (c). Rule 370a, for example, governing equity actions, requires a bill of complaint to contain "a concise statement of the facts upon which the plaintiff seeks relief, and such averments as may be necessary to entitle him to the relief sought. . . ." Although a complainant need not "state minutely all the circumstances which may conduce to prove the general charge," it *is* necessary to allege the cause of action "with reasonable certainty, clearness and accuracy so as to apprise the defendant of the nature of the claim brought against him." *Smith v. Shiebeck,* 180 Md. 412, 420 (1942). *See also Fletcher v. Havre de Grace Co.,* 229 Md. 196, 200 (1962), giving a similar construction to Maryland Rule 301.

This is particularly important for purposes of §§ 8-103 and 8-104. If an action in court is to suffice as a claim against an estate, as the statute permits, it must give the personal representative reasonable notice of the nature of the claim — what it is he is being asked to do, what relief is being sought. Where the claim is for the payment of money, that necessarily implies some statement of, or method of calculating, the amount being sought. Otherwise, the personal representative's ability to administer the estate in a prompt and efficient manner would be significantly hampered.

It is true, as appellant points out, that under Maryland Rule 320c.1, amendments may be made to the bill of complaint at any time before judgment and that, under a general prayer for relief, a complainant may be afforded any kind of relief which is (1) consistent with the specific remedies sought and (2) warranted by the allegations in his bill. *See Terry v. Terry,* 50 Md.App. 53 (1981), and the cases reviewed therein. That does not mean, however, that a general prayer for relief suffices as the presentment of a claim under § 8-104 or that a specific prayer for relief filed after the

six-month period, though permissible under Maryland Rule 320, constitutes a timely presentment under § 8-103 merely because such relief might have been possible under the general prayer.

Section 8-103, read in conjunction with § 8-104, requires that the claim directed to be presented within the six-month period be sufficiently clear and certain as fairly to apprise the personal representative of what the claimant is seeking. That requirement simply is not met by a general prayer for relief, which tells the personal representative next to nothing. The personal representative cannot be left to guess what kinds of specific claims might eventually spring forth from such a prayer at one or more points in the future.

Upon this record, it is clear that appellant's alternative claim for money damages was not timely presented, and that the court was correct in its entry of summary judgment. *Cf. Hamilton v. Thirston,* 94 Md. 253 (1902).

*Judgment affirmed; appellant to pay the costs.*